Joseph N. Froehlich (JF 5221)
LOCKE LORD LLP
200 Vesey Street, 20th Floor
New York, NY  10281-2101
(212) 415-8600
*Attorneys for Petitioners*
*Certain Underwriting Members at Lloyd's, London*
*Subscribing to Treaty No. 0272/04*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CERTAIN UNDERWRITING MEMBERS AT LLOYD'S, LONDON SUBSCRIBING TO TREATY NO. 0272/04, <br><br> Petitioners, <br><br> v. <br><br> INSURANCE COMPANY OF THE AMERICAS, <br><br> Respondent. | Case No. 16-cv-374 |

## PETITIONERS' MOTION TO VACATE OR MODIFY ARBITRATION AWARD

Petitioners Certain Underwriting Members at Lloyd's, London Subscribing to Treaty No. 0272/04 (the "Third-Layer Underwriters" or "Third Layer"), by and through their attorneys, Locke Lord LLP, respectfully move for an Order vacating or, in the alternative, modifying an arbitration award by a three-member arbitration panel (the "Panel") on October 19, 2015 (the "Award") and, in support thereof, submits the following:

## I.      INTRODUCTION

This motion arises out of a complex reinsurance arbitration brought by Insurance Company of the Americas ("ICA") to resolve certain coverage issues relating to two underlying workers' compensation claims.  The dispute over coverage giving rise to said arbitration involved only ICA and Lloyd's underwriters who subscribed to Agreement No. 0274/04 comprising of: (1) first-layer

coverage with limits of $1.5 million excess of $1 million; and (2) second-layer coverage with limits of $2.5 million excess of $2.5 million (collectively, the "First and Second Layers"). Petitioners, who were not a party to this coverage dispute, are those Underwriters subscribing to a separate third-layer excess reinsurance treaty (Agreement No. 0272/04) issued with limits of $5 million excess of $5 million (the "Treaty"). A true and correct copy of the Treaty wordings are annexed hereto as Exhibit "A" to the Declaration of Joshua P. Broudy in Support of the Third-Party Underwriters Motion to Vacate or Modify Arbitration Award ("Broudy Decl.").

The instant motion is necessitated by ICA's failure to provide either proper notice of the underlying claims at issue to, or service of ICA's demand for arbitration upon, the Third-Layer Underwriters. In fact, the Third-Layer Underwriters were never properly notified of the arbitration until after the issuance of the adverse Award, at which time they immediately took steps to rectify the situation, including submitted a letter to the Panel objecting to the Award due to (among other grounds) the lack of service of the arbitration demand. To date, the Panel has not ruled on these objections.

ICA is a sophisticated insurer who purposely chose to place reinsurance in the London Market. It knew, or certainly should have known, how to effectuate proper service and notice on the Third Layer in accordance with the Treaty, Lloyd's custom, and the law, but failed to do so. The Treaty itself provides two such methods of service, which plainly inure to ICA's benefit (if used correctly) by alleviating the burden of personally serving the numerous syndicates which have subscribed to the Treaty. There is an "Intermediary" clause which allows for communications between the parties to be made through a designated intermediary, Gresham Insurance Brokers Limited ("Gresham"). However, Gresham had been defunct for *four years* before ICA's arbitration demand was made. ICA was aware of Gresham's insolvency, yet failed to amend the Treaty or otherwise designate a new intermediary or broker. ICA's service of its arbitration demand upon the long-defunct Gresham was thus plainly ineffective.

- 2 -

ICA also could have invoked the "Service of Suit" clause, which designates agents for service of process, but chose not do so.  Failing that, the law and Lloyd's custom *still* allow a reinsured to effectuate proper service without having to serve each underwriter individually so long as it is made upon the lead underwriter and claims administrator, in this case, Faraday Syndicate 435 ("Faraday"), or one its nominated agents.  However, there is no evidence that ICA attempted to ascertain the identity of the lead for the Third Layer, and certainly never contacted it about the arbitration.

Because of ICA's failure to effectuate proper service of its arbitration demand, the Third-Layer Underwriters have been substantially prejudiced and deprived of their due process rights to fully and fairly participate in this arbitration.  Specifically, the Third-Layer Underwriters lacked any opportunity to participate in the instant dispute in any meaningful way, including, but certainly not limited to:  (1) selecting a party-appointed arbitrator; (2) agreeing to the retention of outside counsel; (3) raising separate third layer-specific defenses; or (4) offering any additional evidence supporting the position that there was no coverage for the underlying losses.  *See* Affidavit of Gerald M. Lynch of Faraday ("Faraday Aff."), Broudy Decl., Exh. "B".

In addition, arbitration was demanded against the Third-Layer Underwriters "should the Claim rise to that level."  In other words, ICA's demand for arbitration against the Third-Layer Underwriters was contingent upon one of the underlying claims impacting the $5 million excess of $5 million layer.  To date, upon information and belief, ICA's claim for alleged damages has not reached the Third Layer.  Accordingly, the Award as it pertains to the Third-Layer Underwriters is premature.

Because the Panel issued an Award against a party and involving a matter not properly before them in the first instance, and because the Third-Layer Underwriters have been completely deprived of a full and fair opportunity to present their case, the Award should be vacated or modified as it pertains to the Third-Layer Underwriters.  In the alternative, if this Court finds that the Third-Layer

Underwriters are bound by the Award, then the Third-Layer Underwriters hereby join in and adopt the arguments set forth in the Motion to Vacate Arbitration Award filed by the First and Second Layer Underwriters in the related proceedings in this District entitled *Certain Underwriting Members at Lloyd's of London v. Insurance Company of the Americas*, No: 1:16-CV-00323. *See* First and Second Layer Underwriters' Petition papers, Broudy Decl., Exh. "C".

II.  **STATEMENT OF QUESTIONS INVOLVED**

1.  Whether the Award should be vacated due to lack of service of the arbitration demand and resulting deprivation of the Third-Layer Underwriters' due process rights to fully and fairly participate in the arbitration?

Suggested Answer:  Yes.

2.  Whether the Award should be vacated should the Panel refuse to hear evidence pertinent and material to the controversy?

Suggested Answer:  Yes.

3.  Whether the Award should be vacated or modified because the Panel exceeded its powers by issuing an Award against a party never properly brought into these proceedings?

Suggested Answer:  Yes.

4.  Whether the Award should be vacated or modified because the Panel prematurely issued an Award against a party and involving a matter not properly before it?

Suggested Answer:  Yes.

III.  **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

ICA writes workers' compensation insurance for professional employment organizations. ICA purchased three layers of excess reinsurance cover from certain Lloyd's underwriters for a period of 12 months commencing December 31, 2004.  Gresham brokered the placement of the treaties.

The First and Second Layers are both led by Atrium Syndicate 0570, while Faraday serves as the lead underwriter and claims administrator for the Third Layer.  Under Lloyd's custom and practice, the lead underwriter's input and consent is required on all claims and arbitration-related decisions under a reinsurance treaty, including but not limited to: (1) whether to accept or deny coverage for any claims submitted under the treaty; (2) the retention of outside counsel or other experts; (3) the retention of a party-appointed arbitrator; (4) the type of arbitration procedures Underwriters wish to utilize; and (5) the strategy to be implemented by Underwriters in an arbitration proceeding.  *See* Broudy Decl., Exh. "B", ¶ 3.

In or about March 2011, ICA gave notice to the First and Second Layers of two workers' compensation claims filed by Alan Kringel and Leon Arnold.  ICA did not provide notice to the Third Layer, presumably because ICA's claims for alleged damages at the time were well below the $5 million attachment point for the Third Layer.  To date, upon information and belief, ICA's claimed damages have still not implicated the Third Layer.  ICA subsequently waited until November 2013 to actively pursue reimbursement, but, even then, only from the First and Second Layers.  In or around January 2014, the First and Second Layers declined coverage for the two claims.

Faraday and the Third-Layer Underwriters have never, at any time, received proper notice from ICA of the claims at issue under the Treaty.  *See* Broudy Decl., Exh. "B", ¶ 5.  Faraday and the Third-Layer Underwriters have never received any status reports or requests for reimbursement from ICA on the claims at issue, nor have they received any loss runs, bordereaux or proof of loss amounts from ICA supporting its claim for alleged damages.  As a result, the Third-Layer Underwriters have never issued any position to ICA as to whether coverage was available under the Treaty for such claims.  *Id.*  On or about December 23, 2014, ICA sent a demand for arbitration letter via Federal Express to: (1) Gresham; (2) Clive Harris of Atrium; and (3) Ted Davey of RFIB, a brokerage firm.  *See* Broudy Decl., Exhibit "D".  However, Gresham was placed into liquidation in or around May

2010, over four years before ICA's demand for arbitration was made.  By then, ICA had known for (at the very least) almost three years that Gresham was defunct, making it imperative for ICA to ensure that service of the arbitration demand was actually received by the appropriate reinsurers, in this case, Faraday.  However, ICA never amended the Treaty or otherwise designated a new intermediary or broker.

Mr. Harris of Atrium is the lead underwriter for the First and Second Layers.  ICA and Mr. Harris had been dealing with each other in the context of the coverage issues involving the First and Second Layers since 2011.  Mr. Davey was apparently a liaison between Atrium and ICA regarding the coverage dispute that led to the arbitration demand.  The Third Layer was never a party to this coverage dispute.

ICA's demand for arbitration was specifically directed to the First and Second layers.  The letter makes only a single reference to the Third Layer (in parentheticals and a footnote) in which it demanded arbitration "should the [Kringel] Claim rise to that level".  Faraday, who is not listed as an addressee, was never properly served with this arbitration demand.  *See* Broudy Decl., Exh. "B", ¶ 8.

The arbitration apparently proceeded for approximately ten months without any specific input or involvement whatsoever from Faraday and the Third-Layer Underwriters.  Faraday was deprived of any opportunity to provide its consent with respect to the selection of a party-appointed arbitrator, in violation of its rights under the arbitration clause of the Treaty.  *Id*. at ¶ 9.  Faraday also had no involvement in agreeing to the retention of Timothy Stalker, the counsel who represented the First and Second Layers, in contravention of Lloyd's claim scheme protocols.  Additionally, Faraday, on behalf of the Third-Layer Underwriters, was denied the opportunity to agree or provide input on: (1) the procedures to be used in connection with the arbitration; (2) any response/answer to the causes of action asserted by ICA in its arbitration demand; (3) the nature and extent of any discovery; and (4) the strategy to be implemented in connection with the arbitration, including but not limited to, identity of witnesses, exhibits, and any special defenses.  *Id.*, ¶¶ 11-12.

The arbitration proceeded to hearing and the Award was subsequently issued against all three layers on October 19, 2015.  *See* Broudy Decl., Exh. "E".  With respect to the Third Layer, the Award was contingent upon ICA's alleged damages for the Kringel claim exceeding $5 million, which, upon information and belief, has not occurred.  It was only after the Award was issued that Faraday received proper notice of the arbitration.  Faraday subsequently took immediate steps to challenge the Award improperly issued against it, including submitting a letter to the Panel on December 3, 2015.  *See* Broudy Decl., Exh. "B", ¶ 13; Exh. "F".  Five weeks later, on January 8, 2016, ICA provided a response.  A reply on behalf of the Third-Layer Underwriters was submitted on January 15, 2016.  To date, the Panel has not ruled on these objections.

IV.   **ARGUMENT**

A.   **Applicable Standards Governing Vacatur**

There are several grounds upon which the Court should grant vacatur in this case.  As an initial matter, the lack of service of the arbitration demand and resulting deprivation of Underwriters' due process rights to meaningfully participate in the arbitration in and of itself warrants vacatur of the Award.  Courts in New York are tasked with ensuring that the arbitration proceedings meet the principles of "fundamental fairness" and due process, which entitle all parties to notice and an opportunity to be heard.  *Konkar Maritime Enters., S.A., v. Compagnie Belge D'Afretement*, 668 F. Supp. 267, 271 (S.D.N.Y. 1987).  At a minimum, due process requires "the opportunity to be heard at a meaningful time and in a meaningful manner."  *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). "If this procedural due process requirement is not met, a district court will not hesitate to vacate the award."  *Kaplan v. Dunhill, Inc.*, No. 96-0258, 1996 WL 640901, *5 (S.D.N.Y. Nov. 4, 1996) (*citing Amalgamated Cotton Garment & Allied Industries Fund v. J.B.C. Co. of Madera, Inc.*, 608 F. Supp. 158, 164-615 (W.D. Pa. 1984) ("[W]e cannot enforce an arbitration award where the evidence does not establish that the parties did in fact receive proper notice and the opportunity to be present at the arbitration proceeding.")).

In *Kaplan*, *supra*, the court vacated an award based on lack of notice of the arbitration proceedings where there had been no communications between the parties, even though (unlike in this case) a notice of hearing had been sent to the petitioner, but had been misplaced by petitioner's secretary.   The court decided to vacate the award in light of petitioner's "substantial, undisputed evidence demonstrating that it did not receive notice of the hearing and that it immediately took steps to rectify the situation once it learned a hearing had been held in its absence."  *Id*. at *6-7.  *See also Choice Hotels Intern., Inc. v. SM Property Management*, LLC, 519 F.3d 200, 208 (4th Cir. 2008) (arbitration award vacated where respondent did not appear due to lack of proper notice to the contractually-designated representative).

The Award should also be vacated under Section 10(a)(3) of the Federal Arbitration Act ("FAA") because the Panel failed to provide the Third-Party Underwriters with the ability to be heard and therefore deprived them of a fundamentally fair hearing.  Absent a future ruling by the Panel allowing the Third-Party Underwriters an opportunity to present their case, the Panel is "guilty of misconduct in … refusing to hear evidence pertinent and material to the controversy…."  9 U.S.C. § 10(a)(3).  "'A denial of fundamental fairness in the arbitration proceeding will warrant vacating the award.'" *Attia v. Audionamix, Inc.*, No. 14 Civ. 706 (RMB), 2015 WL 5580501, (S.D.N.Y. Sept. 21, 2015).  In *Kaplan, supra*, the court vacated an arbitration award in part under Section 10(a)(3) where the panel refused to reopen the arbitration after a party informed the panel that it was not given proper notice of the arbitration.  *Id*., 1996 WL 640901 at ** 6-7.

Additionally, the Award can be vacated or modified where, as here, the Panel exceeded its authority or "awarded upon a matter not submitted to them".  *See* 9 U.S.C. § 10(a)(4) and 11(b). Here, the purpose of effectuating service of an arbitration demand is to ensure that the opposing party has timely notice of the arbitration and ample opportunity to be heard.  Without proper service, the Panel lacks jurisdiction over that party.  The Third-Layer Underwriters were therefore never a proper

party to the arbitration, and, as a result, the Panel exceeded its authority by including them within the scope of the Award.[1]

Furthermore, the Third-Layer Underwriters were never a party to the coverage dispute which gave rise to the arbitration.  ICA never reported the claims at issue to the Third-Layer Underwriters, nor have they sought reimbursement.  No loss runs, bordereaux, or proof of loss amounts have ever been provided to the Third Layer.  ICA made its arbitration demand contingent upon the Kringel claim reaching the Third Layer.  Upon information and belief, however, ICA never presented evidence in the arbitration that such claim has implicated, or will ever implicate, the Third Layer.  Because the Panel exceeded its authority by prematurely issuing an Award against a party and involving matters never properly submitted to them in the first instance, the Award should be vacated or modified.

**B.   The Award Should Be Vacated Because the Third-Layer Underwriters Were Deprived of Their Rights to Meaningfully Participate in the Arbitration**

There were two methods available to ICA under the Treaty to effectuate service of its arbitration demand:  (1) the "Intermediary" clause (Article 27); as well as (2) the "Service of Suit" clause (Article 26).  The "Intermediary" clause designated Gresham as the "intermediary" through which "all communications…relating [to all business under the Treaty] shall be transmitted to the Reinsured or Reinsurers…."  *See* Broudy Decl., Exh. A.  However, Gresham was placed into liquidation in or around May 2010, over four years before ICA's demand for arbitration was made.

---

[1] Because the Third-Layer Underwriters are foreign insurers domiciled in the United Kingdom and other foreign states, the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention") governs the Award.  9 U.S.C. § 202; *F. Hoffmann-La Roche Ltd. v. Qiagen Gaithersburg, Inc.*, 730 F. Supp. 2d 318, 324 (S.D.N.Y. 2010).  Article V of the Convention specifies seven grounds for refusal of recognition of an arbitration award, one of which is that a party "was not duly notified of the appointment of the arbitrator or the arbitration procedure to be followed or was unable, for any other reason, to present his case."  Article V(1)(b).  Courts in New York have interpreted this ground to imply the forum state's standards of due process.  *See Parsons & Whittemore Overseas co. v. Societe Generale*, 508 F.2d 969, 975-76 (2d Cir. 1974).  Additionally, under the "Controlling Law" clause (Article 25) of the Treaty, New York law governs this dispute.  Section 7511 of the CPLR provides grounds for vacating an award for "a party who neither participated in the arbitration nor was served with a notice of intention to arbitrate."  N.Y. C.P.L.R. § 7511.

At the time of the commencement of the arbitration proceeding, ICA had known for almost three years (at a minimum) that Gresham was defunct, making it imperative for ICA to ensure that service of the arbitration demand was actually received by the appropriate reinsurers, in this case, Faraday. Despite such knowledge, however, ICA never amended the Treaty to designate a new intermediary. Nor is there any evidence of ICA ever retaining a Lloyd's registered broker to act on its behalf, which is typically how a reinsured such as ICA communicates with Lloyd's underwriters.   Broudy Decl., Exh. "B", ¶ 4.

ICA's awareness of Gresham's defunct status required ICA to employ the "Service of Suit" clause (Article 26) of the Treaty, which designates agents for service of process upon Faraday and the Third-Layer Underwriters.   "[T]he purpose of the service of suit clause is, in part, to anticipate the burden of personally serving the numerous members of each Lloyd's syndicate individually and avoid it by designating a uniform agent for all."   *Employers Ins. of Wausau v. Banco De Seguros Del Estado*, 199 F.3d 937, 945 (7th Cir. 1999).   The Treaty's Service of Suit clause provides in relevant part that:

> [T]he Reinsurer hereby designates the party named in its Interests and Liabilities Agreement, or if no party is named therein, the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as its true and lawful attorney upon whom may be served lawful process in any action, suit *or proceeding instituted by or on behalf of the Reinsured or any beneficiary hereunder arising out this Agreement*.

*See* Treaty, Article 26 (ICA Response, Exh. B) (emphasis supplied).

In this case, Lord Bissell & Brook, now known through merger as Locke Lord LLP, the undersigned's law firm, is identified in the slip as the agent for service of process.   *See* Broudy Decl., Exh. "G".   However, there is no evidence indicating that ICA attempted to effectuate service of the arbitration demand upon Lord Bissell/Locke Lord, the New York Department of Financial Services ("DFS"), or, for that matter, any other state insurance commissioner.

- 10 -

Failing the above, there is still a third option available to a reinsured in lieu of having to serve each underwriter individually. Courts have permitted a reinsured to effectuate proper service upon multiple Lloyd's underwriters subscribing to a treaty by serving the lead underwriter and/or one of its designated agents for service. *See Employers Ins. of Wausau v. Banco De Seguros Del Estado*, 34 F. Supp. 2d 1115 (E.D. Wis. 1999), *aff'd*, 199 F.3d 937 (7th Cir. 1999). Here, Faraday is identified on the placing slip for the Treaty as the lead underwriter. *See* Broudy Decl., Exh. "G". However, Faraday was never served with the arbitration demand, either directly or through a designated agent.

As for the arbitration demand itself, Faraday was not even listed as an addressee. *See* Broudy Decl., Exh. "D". Nor were Lord Bissell/Locke Lord, DFS, or any other state insurance commissioner. Instead, ICA addressed its demand to the long-defunct Gresham, which was plainly ineffective, and the same individuals it had been dealing with in connection with the coverage issues involving the First and Second Layers: (1) Clive Harris of Atrium, the lead underwriter and claims administrator for the First and Second Layers; and (2) Ted Davey of RFIB, whom was apparently acting as a liaison between Atrium and ICA regarding the coverage dispute that gave rise to the instant arbitration.

Mr. Davey of RFIB, who apparently used to work at Gresham, had never, at any time, been granted authority to accept the arbitration demand on behalf of the Third Layer. In order to do so, Mr. Davey would have needed to be specifically designated by Faraday as the agent or intermediary to whom all notice/service under the Treaty should be sent, which designation has never taken place. Broudy Decl., Exh. B, ¶ 7. *See Minskoff v. Am. Exp. Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996) (authority of agent "exists only where the agent may reasonably infer from the words or conduct of the principal that the principal has consented to the agent's performance of a particular act."). In fact, Faraday never directly engaged in any communications with Mr. Davey or ICA regarding either the claims at issue or the arbitration. Faraday Aff., Exh. A, ¶ 7. Thus, there could not have been any communications from Faraday that would have led ICA to believe that Mr. Davey

was acting as an intermediary or agent for the Third Layer.  See *Mason Tenders Dist. Council v. JNG Const. Ltd.*, No. 00 CV 1032 GBD, 2003 WL 22999453, at *4 (S.D.N.Y. Dec. 19, 2003) (Apparent authority arises from the principal's words or actions which, reasonably interpreted, leads a third party to believe that the principal consents to the purported agent acting on his behalf).  Further, the onus was clearly on ICA to determine whether Mr. Davey was, in fact, an authorized agent/representative of the Third Layer, particularly given Gresham's insolvency and the fact that the coverage dispute at issue involved only the First and Second Layers.  However, there is no evidence that ICA made any such inquiries to Mr. Davey or, for that matter, Mr. Harris.  *See Gen. Overseas Films, Ltd. v. Robin Int'l, Inc.,* 542 F. Supp. 684, 695 (S.D.N.Y. 1982) *aff'd sub nom.* 718 F.2d 1085 (2d Cir. 1983) ("The duty of diligence in ascertaining whether an agent is exceeding his authority devolves on those who deal with him, not on his principal.").

Regarding Mr. Harris, we anticipate that ICA may argue that because Atrium also subscribed to the Third Layer, the Third-Layer Underwriters somehow possessed imputed notice of the arbitration – an argument which fails and misleads on a number of levels.  For example, Atrium was never designated as an agent for service upon each of the underwriters and syndicates comprising the Third Layer.  There also can be no legitimate dispute that ICA's demand for arbitration was clearly directed to Mr. Harris in his capacity as lead for the First and Second Layers.  ICA had been dealing with him since 2011 in connection with the coverage issues involving the first two layers.  Atrium also was only one of several syndicates who subscribed to the Third Layer, and ICA was charged with ensuring service upon all underwriters participating in the Treaty.  Some of those syndicates, namely, Amlin Syndicate 2001 and Chaucer Syndicate 1084, only participated on the Third Layer, and not the First and Second Layers, thereby underscoring the appreciable prejudice resulting from ICA's lack of proper service.

Additionally, under New York law, which governs this matter pursuant to Article 25 of the Treaty, ICA cannot use any purported "constructive notice" as an excuse for not adhering to its notice and service obligations under the Treaty, Lloyd's custom and the law.  "[I]t is well established that an insured may not rely on the doctrine of constructive notice.  The general rule is that '[n]either notice provided by another insured nor the insurer's actual knowledge of the claim satisfies the contractual obligation of an insured to give timely notice.'"  *Ins. Co. of the State of Pennsylvania v. Argonaut Ins. Co.,* No. 12 CIV. 6494 DLC (ICSOP), 2013 WL 4005109, at *10 (S.D.N.Y. Aug. 6, 2013) (collecting New York cases).  Indeed, in *Argonaut*, the court rejected a similar argument to the one we anticipate ICA making here, namely, that the reinsurer received constructive notice pursuant to a claim made by a reinsured under a different reinsurance contract.  *Id*.

There were several means, both specifically set forth in the Treaty or otherwise, by which ICA could and should have properly effectuated service of the arbitration demand upon the Third Layer.  Instead of honoring either the Treaty language or the protocols deemed acceptable by well-established Lloyd's custom and/or the law, ICA opted to serve an intermediary, Gresham, which it had known to be insolvent for numerous years.  ICA also chose not to use the Service of Suit clause.  Moreover, there is no evidence of any efforts on the part of ICA to identify (or notify) Faraday as a proper recipient of the arbitration demand for the Third Layer.  Where, as here, there are many reinsurers and only one reinsured, it is customary at Lloyd's for the party in ICA's shoes to deal with only the lead underwriter.  *See Banco De Seguros Del Estado*, *supra*, 34 F. Supp. 2d at 1121.  As with the Treaty provisions discussed above, this plainly inures to ICA's benefit.  Rather than having to serve each syndicate or underwriter individually through arduous Hague Convention procedures, ICA need only to have informed Faraday and/or its designated agents of matters relating to the operation of the Treaty, but failed to do so.  *Id*.

Unlike when it participates as a member of the "following market", as it did here on the lower layers, Faraday, in its capacity as lead, must consent to all claims and arbitration-related

decisions involving the Treaty.   Broudy Decl., Exh. B, ¶ 9.   However, the instant arbitration apparently proceeded for approximately ten months without any specific input or involvement whatsoever from Faraday and the Third-Layer Underwriters.  *Id.*, ¶¶ 9-12.[2]  Additionally, Faraday, on behalf of the Third-Layer Underwriters, was denied the opportunity to agree or provide input on: (1) the procedures to be used in connection with the arbitration; (2) any response/answer to the causes of action asserted by ICA in its arbitration demand; (3) the nature and extent of any discovery; and (4) the strategy to be implemented in connection with the arbitration, including but not limited to, identity of witnesses, exhibits, and any special defenses.  *Id.*, ¶¶ 11-12.

Had Faraday and the Third-Layer Underwriters received proper service of the arbitration demand, the arbitration would have looked markedly different.   Faraday, on behalf of the Third Layer, would have proceeded to raise and maintain certain defenses in the arbitration unique to that layer, such as:  (1) lack of notice of the underlying losses at issue; and (2) the expiration of the 84-month sunset provision contained in the commutation clause (Article 16) of the Treaty.   Such clause effectively operates as a sunset provision for future liabilities, and required the parties to commute or settle based upon the known exposures/reserves at a specified period of time.   This clause is mandatory, not permissive.   In essence, the Third-Layer Underwriters are not responsible for any liabilities that were not reported by the cut-off date (i.e., December 31, 2012), such as the underlying claims at issue.

---

[2] ICA also may attempt to argue that it believed that Mr. Stalker was also representing the Third-Layer Underwriters at the arbitration, which assertion is untrue and unfounded.  *Id.*, ¶ 9.  Even assuming, *arguendo,* that Mr. Stalker "held" himself out to the Panel and ICA as counsel for the Third Layer, he is not able to confer authority upon himself without any statements or conduct attributable to Faraday indicating that he represented the Third Layer. "Second Circuit case law supports the view that apparent authority is created only by the representations of the principal to the third party, and *explicitly rejects the notion that an agent can create apparent authority by his own actions or representations*."  *Mason Tenders Dist. Council, supra,* 2003 WL 22999453, at *4.   Here, Faraday never directly engaged in any communications with Mr. Stalker or ICA regarding either the claims at issue or the arbitration prior to the issuance of the Award.  Thus, neither actual nor apparent authority can be conferred upon him.

The Third-Layer Underwriters also would have attempted to take discovery regarding ICA's claims for alleged damages.  Moreover, the Third-Layer Underwriters would have offered additional documentary evidence and/or witnesses at the arbitration hearing to support the position that there was no coverage for these losses under the Treaty, including but not limited to, evidence in the placing slip that the Treaty was underwritten by the Workers' Compensation Clash Consortium.  See Faraday Aff., Exh. A, ¶¶ 11-12; Exhibit "G".  Such evidence is highly material to the coverage dispute at issue in the arbitration because a Clash Treaty provides coverage only where two or more persons are injured from the same "loss occurrence" or event, and ICA has admitted that the Kringel and Arnold claims arise from separate loss occurrences.  *See* Broudy Decl., Exh. "C", First and Second Layers' Petition to Vacate, ¶¶ 32-35; 90-96.

### C.   The Award Should Be Vacated or Modified Because the Panel Prematurely Issued an Award for a Matter Not Properly Brought Before It

The Third-Layer Underwriters were never a party to the coverage dispute which gave rise to the arbitration.  ICA has never reported the underlying claims to the Third-Layer Underwriters, nor sought reimbursement from them.  It has not provided the Third-Layer Underwriters with any loss runs, bordereaux or proof of loss amounts relative to the claims at issue.  As a result, the Third-Layer Underwriters have neither admitted nor denied coverage for the underlying claims.  Upon information and belief, ICA's claim for alleged damages have not yet, and may never, implicate the Third Layer.  Under New York law, a request for declaratory relief such as the one made by ICA here "is premature if the future event is beyond the control of the parties and may never occur."  *New York Pub. Interest Research Group v. Carey*, 42 N.Y. 2d 527, 531 (1978).  In this case, ICA made its demand contingent upon the Kringel claim implicating the Third Layer.  Upon information and belief, there was no evidence presented in the arbitration showing that the Kringel claim has implicated, or will ever implicate, the Third Layer.  Thus, the Award is merely advisory since it cannot have any immediate effect and the issue may never be resolved.  Accordingly, the Panel

exceeded its authority by prematurely deciding a matter not properly before it.  As such, the Award should be vacated or modified as it pertains to the Third-Layer Underwriters.

## V.  <u>CONCLUSION</u>

For the foregoing reasons, the Third Layer Underwriters respectfully request that this Court vacate or modify the Award as it pertains to the Third-Layer Underwriters.  In the alternative, if the Court finds that the Third-Layer Underwriters are bound by the Award, the Third-Layer Underwriters respectfully request that the Court vacate the Award for the reasons set forth in the Petition to Vacate Arbitration Award filed by the First and Second Layer Underwriters in the related proceedings in this District entitled *Certain Underwriting Members at Lloyd's of London v. Insurance Company of the Americas*, No: 1:16-CV-00323.

Dated:  New York, New York
        January 19, 2016

<div style="margin-left:40%">

<u>s/ *Joseph N. Froehlich*</u>
Joseph N. Froehlich (JF 5221)
LOCKE LORD LLP
200 Vesey Street, 20th Floor
New York, NY  10281-2101
(212) 415-8600
*Attorneys for Petitioners*
*Certain Underwriters at Lloyd's, London*
*Subscribing to Treaty No. 0272/04*

</div>