UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
CERTAIN UNDERWRITING MEMBERS AT LLOYD'S,
LONDON SUBSCRIBING TO TREATY NO. 0272/04,

Index No. 1:16-cv-00374-VSB

Petitioner,

            -v.-

INSURANCE COMPANY OF THE AMERICAS,

Respondent.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**INSURANCE COMPANY OF AMERICAS'**
**MEMORANDUM OF LAW IN OPPOSITION TO THE**
**<u>THIRD LAYER UNDERWRITERS' MOTION TO VACATE AWARD</u>**

Philip J. Loree Jr. (PL-2213)
LOREE & LOREE
830 Third Avenue
Fifth Floor
New York, New York 10022
(646) 253-0560
(516) 627-1720 (alternative phone no.)
(516) 941-6094 (mobile)
Fax: +1 (800) 627-3118
PJL1@LoreeLawFirm.com

ATTORNEYS FOR RESPONDENT
INSURANCE COMPANY OF THE
AMERICAS

TABLE OF CONTENTS

INTRODUCTION ............................................................................. 1

SUBJECT MATTER JURISDICTION ................................................ 1

SUMMARY OF ARGUMENT .......................................................... 3

BACKGROUND AND PROCEDURAL HISTORY ................................. 4

ARGUMENT .................................................................................. 13

POINT I ....................................................................................... 13

THE THIRD LAYER UNDERWRITERS HAD ACTUAL AND CONSTRUCTIVE
NOTICE OF THE ARBITRATION PROCEEDINGS BECAUSE THE LEAD
UNDERWRITERS OF BOTH TREATIES WERE PARTIES TO THE ARBITRATION ....... 13

    A.    Legal Standards ..................................................................... 13

    B.    ICA Notified the Third Layer Underwriters, using the Treaties'
Intermediary Clauses, which Required Notice to the Underwriters to be Sent to the
London Broker ...................................................................................... 18

    C.    The Lead Underwriters on Both Treaties had Actual or Constructive Notice
of the Arbitration Demand and of the Arbitration Itself ............................................ 21

    D.    The Third Layer Reinsurers Have No Defenses That Were Not Raised in the
Arbitration. 22

    E.    The Underwriters' Arguments About ICA Being Responsible for Replacing
Gresham are Misplaced ........................................................................... 23

    F.    All of the Third Layer Reinsurers' Notice-Related Arguments are Misplaced
because Faraday and Atrium had Actual or Imputed Knowledge of the Arbitration ... 24

    G.    The Third Layer Reinsurers' Request for the Panel to Determine the Issue
may Result in Further Delay Because the Third Layer Reinsurers have Made their
Application to the Panel under a Reservation of Rights ............................................ 24

    POINT II ..................................................................................... 24

THE THIRD LAYER REINSURERS' ARGUMENTS INCORPORATED BY
REFERENCE FROM FIRST AND SECOND LAYER UNDERWRITERS' MOTION TO
VACATE ICA i ARE UNAVAILING ............................................................................ 25

CONCLUSION ................................................................................................. 26

TABLE OF AUTHORITIES

Cases

*., Scandinavian Reinsurance Co. v. Saint Paul Fire and Marine Ins. Co.*, 668 F.3d 60, 71
(2d Cir. 2012) ............................................................................. 8, 9, 20

*21st Century Financial Serv., L.L.C. v. Manchester Financial Bank*, 747 F.3d 331,  337-
38 (5th Cir. 2014) ................................................................................ 23

*Bernstein Seawell & Kove v. Bosarge,* 813 F.2d 726 (5th Cir.1987))............................ 23

*Employers Ins. of Wausau v. Banco Seguros de Estado*, 199 F.3d 937, 943 (7th Cir.
1999) ................................................................................................... 22

*Environmental Barrier Co. v. Slurry Sys.*, 540 F.3d 598, 606 (7th Cir. 2008) ............... 10

*First State Ins. Co. v. Banco de Seguros Del Estado*, 254 F.3d 354, 357 (1st Cir. 2001)
................................................................................................... 22

*Gingiss Intern., Inc. v. Bormet,* 58 F.3d 328, 332  (7th Cir. 1995)................... 20, 22, 27

*Hall Street Assoc., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 578 (2008) ............................ 20

*Iran Aircraft Industries v. Avco Corp.*, 980 F.2d 141, 146 (2d Cir. 1992)..................... 21

*Karaha* ................................................................................................... 22

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak*, 364 F.3d 274, 298-99 (5th
Cir., 2004) ........................................................................................... 21

*Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*, 729 F.3d 99, 104,
107 (2d Cir. 2013) ................................................................................. 21

*Marino v. Writers Guild of Am., East, Inc.*, 992 F.2d 1480, 1483-84 (9th Cir. 1993) .... 10

*Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) ........................................... 22

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Lecopulos*, 553 F.2d 842, 845 (2d Cir.1977)
................................................................................................... 23

*Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314-15 (1950) ................ 22

*Opals on Ice Lingerie* v. *Body  Lines Inc.*, 320 F.3d 362, 368-69 (2d Cir. 2002) .......... 10

*Parsons* ..................................................................................................... 21, 22

*Parsons & Whittemore Overseas Co., Inc. v. Societe Generale de L'Industrie du Papier (RAKTA)*, 508 F.2d 969, 975-76 (2d Cir.1974) ....................................................... 21

*Pike v. Freeman*, 266 F.3d 78, 88-90 (2nd Cir. 2000) (Sotomayor, J.) ........................ 10

*Roughneck Concrete Drilling & Sawing Co. v. Plumbers' Pension Fund*, 640 F.3d 761, 766–67 (7th Cir.2011) ................................................................................. 10

*Smith v. Positive Products*, 419 F.Supp.2d 437, 446 (S.D.N.Y.2005) .......................... 23

*Sole Resort, S.A. de* C. *V. v. Allure Resorts Management, LLC,* 450 F.3d 100, 102 (2d Cir. 2007) .............................................................................................. 8

*Sunshine Mining Co. v. United Steelworkers*, 823 F.2d 1289, 1295 (9th Cir.1987)...... 22

the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention") ...................................................................... 8, 9, 20, 21

*Wasau* ............................................................................................................ 23

*Wausau* .......................................................................................................... 28

*Yusuf Ahmed Alghanim & Sons v. Toys "R" Us*, 126 F.3d 15, 21-23 (2d Cir. 1997) ... 8, 9

*Zeiler v. Deitsch*, 500 F.3d 157, 164-65 (2d Cir.2007) ........................................... 8, 9

Statutes

9 U.S.C. § 10(a)(3)........................................................................................ 20, 21

9 U.S.C. § 10(a)(4)........................................................................................ 20, 21

9 U.S.C. § 207 .................................................................................................. 8

9 U.S.C. § 9 ...................................................................................................... 8

9 U.S.C. §§ 201, *et seq.* (2014) ....................................................................................8

Other Authorities

Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the

"Convention") ...........................................................................................................8

Convention, Art. V(1)(b)............................................................................................ 21

Federal Insurance Office, U.S. Department of the Treasury*, The Breadth and Scope of

the Global Reinsurance Market and the Critical Role Such Market Plays in Supporting

Insurance in the United States* 1 (2014) (the "FIO Report"),

https://www.treasury.gov/initiatives/fio/reports-and-notices/Documents/FIO%20-

%20Reinsurance%20Report.pdf ..................................................................... 12, 30

the "Convention")......................................................................................................8



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
CERTAIN UNDERWRITING MEMBERS AT LLOYD'S, LONDON
SUBSCRIBING TO TREATY NO. 0272/04,

Petitioner,

                           -v.-

INSURANCE COMPANY OF THE AMERICAS,

Respondent.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Index No. 1:16-cv-00
VSB

**INSURANCE COMPANY OF AMERICAS'
MEMORANDUM OF LAW IN OPPOSITION TO THE
<u>THIRD LAYER UNDERWRITERS' MOTION TO VACATE AWARD</u>**

<u>**INTRODUCTION**</u>

Respondent Insurance Company of the Americas ("ICA") respectfully submits this memorandum of law in opposition to Petitioner's motion to vacate the arbitration award (the "Award"). It submits a separate memorandum of law in support of its cross-motion to confirm the Award against Petitioner. ICA respectfully requests that the Court deny Petitioner's motion to vacate in its entirety, grant ICA's cross-motion in its entirety and issue an order and judgment confirming the Award against Petitioner.

<u>**SUBJECT MATTER JURISDICTION**</u>

Respondent ICA is an insurance company organized under the laws of Florida, with its principal place of business in Florida. The Petitioner, Certain Underwriters at Lloyd's London Subscribing to Treaty No. 0272/04 (the "Third Layer Underwriters")

are a group of Lloyd's Underwriters that participated in a London-Market placed reinsurance treaty, which contains a written arbitration agreement that contemplates arbitration taking place in the United States. The Award arose out of an arbitration hearing held in New York City in the Borough of Manhattan.

The Third Layer Underwriters are seeking to vacate in part the Award, which falls under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"), and the provisions of Chapter 2 of the Federal Arbitration Act (the "FAA"), which implement the Convention. *See* 9 U.S.C. §§ 201, *et seq.* (2014). ICA cross-moves to confirm the Award under 9 U.S.C. § 9 and 9 U.S.C. § 207.

The Award, although made in the U.S., is not entirely domestic in scope because each of the Third Layer Underwriters are, upon information and belief, domiciled and resident in the United Kingdom, which, like the United States, is a signatory to the Convention. *See, e.g., Scandinavian Reinsurance Co. v. Saint Paul Fire and Marine Ins. Co.*, 668 F.3d 60, 71 (2d Cir. 2012); *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us*, 126 F.3d 15, 21-23 (2d Cir. 1997).

The Court has original subject matter jurisdiction over proceedings involving awards or agreements that fall under the Convention, irrespective of the amount in controversy. 9 U.S.C. § 203 (2014). The petition concerns an award falling under the Convention and is thus an action or proceeding falling under the Convention over which this Court has original jurisdiction. *See, e.g., Scandinavian Re*, 668 F.3d at 71; *Sole Resort, S.A. de C. V. v. Allure Resorts Management, LLC,* 450 F.3d 100, 102 (2d Cir. 2007); *Zeiler v. Deitsch*, 500 F.3d 157, 164-65 (2d Cir.2007)

Because the Award was made in the U.S. the domestic provisions of Chapter 1 of the FAA "also apply, as is permitted by Articles V(1)(e) and V(2) of the.  .

2

Convention." *Scandinavian Re*, 668 F.3d at 71; *Deitsch,* 500 F.3d at 164; *see also Yusuf Ahmed Alghanim* & *Sons,* 126 F.3d at 21-23.

**SUMMARY OF ARGUMENT**

The Third Layer Underwriters argue that they did not receive "proper" notice of the arbitration and were thus allegedly denied an opportunity to appear and protect their legal interests. They do not claim that they did not receive actual or constructive notice – they simply say they received no "proper" notice or were not "served" propertly, which is an effective concession that they received notice of the hearing, just not in the way they apparently think they were required to receive it.

But the Court need not rely on that effective concession to deny the Third Layer Underwriters' motion. The facts show that: (a) ICA provided all the notice to the Third Layer Underwriters that the Treaties required; (b) the Atrium Syndicate ("Atrium") was the lead reinsurer on the First and Second Layer Treaty (Treaty 0247/04), with a 15.23% share of Lloyd's 91.3% line on that Treaty; and (c) the Faraday Syndicate, the lead reinsurer on the Third Layer Treaty, had a 13.04% share of that line. (Hirst Cert. at ¶¶ 35-37 & Exs. Q-S)

Those facts demonstrate that the Third Layer Underwriters' "improper notice" argument presents a classic "heads-I-win-tails-you-lose" proposition: Faraday, the Third Layer Treaty's lead underwriter, and Atrium, one of the other Third Layer Treaty participants, either knew or should have known, from the time of ICA's Arbitration Demand forward, that the Third Layer Treaty was part of the arbitration. (Hirst Cert. at ¶¶ 35-37 & Exs. C, Q-S) Yet despite Faraday and Atrium being privy to all that was going on, in the arbitration, neither they nor any of their attorneys--at any time prior to the arbitrators making their award in favor of ICA--ever advised ICA, ICA's attorneys

3

or the arbitrators that they believed the Third Party Underwriters did not receive "proper" notice of the arbitration. Had the arbitrators ruled in favor of the Third Layer Underwriters, Faraday and Atrium presumably would have remained silent and the Third Layer Underwriters would have sought to have the award confirmed, not vacated.

The Federal Arbitration Act does not permit that kind of wait and see approach to objections to the arbitration or the arbitration process. See, e.g., *Roughneck Concrete Drilling & Sawing Co. v. Plumbers' Pension Fund*, 640 F.3d 761, 766–67 (7th Cir.2011) (failing to raise arbitrability question before the arbitrators criticized as a "heads I win, tails you lose" approach); *Environmental Barrier Co. v. Slurry Sys.*, 540 F.3d 598, 606 (7th Cir. 2008); *Opals on Ice Lingerie* v. *Body Lines Inc.*, 320 F.3d 362, 368-69 (2d Cir. 2002); *Pike v. Freeman*, 266 F.3d 78, 88-90 (2nd Cir. 2000) (Sotomayor, J.) ("'Arbitration is not a trial run in which a party may sit quietly by without raising pertinent issues, wait to see if the result is in his favor and then seek judicial relief as an afterthought.'") (quoting *Marino v. Writers Guild of Am., East, Inc.*, 992 F.2d 1480, 1483-84 (9th Cir. 1993).

As we demonstrate below, "proper notice" in the context of arbitration does not entail formalistic service of process requirements or even compliance with agreed notice procedure—actual or constructive notice is enough. And in this case not only was there actual and constructive notice, but also compliance with contractual notice procedures.

The Court should summarily reject the Third Layer Underwriters' vacatur arguments in their entirety and confirm the award.

## BACKGROUND AND PROCEDURAL HISTORY

4

The pertinent facts are set out in the Certification of Gary T. Hirst (the "Hirst Cert."), and are summarized below:

ICA is a Florida corporation with its principal place of business in Florida. ICA, a privately-held stock corporation, was licensed to write surety and workers compensation insurance in the State of Florida, although it does not currently hold an active certificate of authority in Florida. ICA currently holds or has held certificates of authority to write insurance in a number of states; however, ICA has never held any authority to write insurance, been registered in, or written any insurance in New York State. (Hirst Cert., ¶ 2)

Since, at the latest, May 18, 2009 ICA has not done or transacted any business in New York. The only connection ICA has had with New York since 2009 has its agreement to hold the arbitration that is the subject of this proceeding in New York and its attendance and participation at the arbitration hearings. (Hirst Cert., ¶ 30) Although ICA is subject to personal jurisdiction in New York as respects the arbitration, it has not appointed any of its attorneys (including its arbitration counsel) to act as agents for service of process. (See Hirst Cert. ¶ 30)

This proceeding arose out of a dispute between ICA and its London Market Underwriters participating in two reinsurance treaties (the "Treaties"): (a) Treaty No. 0274/04 (the "First and Second Layer Underwriters"); and (b) Treaty No. 0274/04 (the "Third Layer Underwriters"). As the U.S. Department of Treasury recently described it, "[r]einsurance is a contract of indemnity between commercial parties – an insurer (i.e., the 'cedent' or 'ceding insurer') and one or more 'assuming insurers' (i.e., underwriters) – by which, in exchange for a premium, a specified portion of the risks under one or more insurance policies written by the cedent are transferred ('ceded') to the

5

reinsurers." Federal Insurance Office, U.S. Department of the Treasury, *The Breadth and Scope of the Global Reinsurance Market and the Critical Role Such Market Plays in Supporting Insurance in the United States* 1 (2014) (the "FIO Report"), https://www.treasury.gov/initiatives/fio/reports-and-notices/Documents/FIO%20-%20Reinsurance%20Report.pdf. Reinsurance treaties are "standing reinsurance agreement[s]: in exchange for an agreed premium, a treaty covers a class of insurance risks specified in the contract." FIO Report at 8.

The Treaties are excess-of-loss treaties, that is, a form of nonproportional reinsurance which protects against losses "sustained above a predetermined and stated threshold, known as the cedent's 'retention.'" FIO Report at 10. Part A of Treaty 0274/04 provided ICA with reinsurance in the amount of $1.5 million per occurrence in excess of $1 million per occurrence (i.e., the First Layer). Part B of that Treaty provided reinsurance in the amount of $2.5 million per occurrence excess of $2.5 million per occurrence. Treaty No. 0272/04 provided reinsurance in a maximum amount of $5 million per occurrence excess of $5 million per occurrence, the Third Layer. (Hirst Cert., ¶¶ 6-10 & Exs. A & B)

Both Treaties contain a materially identical arbitration agreement, which provides:

> As a condition precedent to any right of action hereunder, in the event of any dispute or difference of opinion hereafter arising with respect to this Agreement, it is hereby mutually agreed that such dispute or difference of opinion shall be submitted to arbitration. One Arbiter shall be chosen by the Reinsured, the other by the Reinsurer, and an Umpire shall be chosen by the two Arbiters before they enter upon arbitration, all of whom shall be active or retired disinterested executive officers of insurance or reinsurance companies or Lloyd's London Underwriters. In the event that either party should fail to choose an Arbiter within thirty (30) days following a written request by the other party to do so, the requesting party may choose two Arbiters who shall in turn choose an

Umpire before entering upon arbitration. If the two Arbiters fail to agree upon the selection of an Umpire within thirty (30) days following their appointment, each Arbiter shall nominate three candidates within ten (10) days thereafter, two of whom the other shall decline, and the decision shall be made by drawing lots.

Each party shall present its case to the Arbiters within thirty (30) days following the date of appointment of the Umpire. The Arbiters shall consider this Agreement as an honourable engagement rather than merely as a legal obligation and they are relieved of all judicial formalities and may abstain from following the strict rules of law. The decision of the Arbiters shall be final and binding on both parties; but failing to agree, they shall call in the Umpire and the decision of the majority shall be final and binding upon both parties. Judgment upon the final decision of the Arbiters may be entered in any court of competent jurisdiction.

If more than one Reinsurer is involved in the same dispute, all such Reinsurers shall constitute and act as one party for purposes of this Article and communications shall be made by the Reinsured to each of the Reinsurers constituting one party, provided, however, that nothing herein shall impair the rights of such Reinsurers to assert several, rather than joint, defences or claims, nor he construed as changing the liability of the Reinsurers participating under the terms of this Agreement from several to joint.

Each party shall bear the expense of its own Arbiter, and shall jointly and equally bear with the other the expense of the Umpire and of the arbitration. In the event that the two Arbiters are chosen by one party, as above provided, the expense of the Arbiters, the Umpire and the arbitration shall be equally divided between the two parties.
Any arbitration proceedings shall take place at a location mutually agreed upon by the parties to this Agreement, but notwithstanding the location of the arbitration, all proceedings pursuant hereto shall be governed by the law of the state in which the Reinsured has its principal office.

(Hirst Cert., Ex. A, Art. 24; Ex. B, Art. 24)

The dispute arose out of two workers' compensation claims, one of which, the Kringel claim, involved a sixteen-year-old who was sustained catastrophic brain injuries because a diving accident resulted in his brain being totally deprived of oxygen for five minutes leaving him with among other things, a severe case of epilepsy, an inability to communicate, and a need for life-long 24-7 care. (Hirst Cert., ¶12) ICA

has paid approximately $4 million and if Mr. Kringel survives as long as he is expected to, then ICA will have to pay approximately $7.5 million more. (Hirst Cert. at ¶14) And once ICA's additional, future payments exceed $1 million, then the Third Layer Reinsurers will have to begin paying their respective shares of the claim. (Hirst Cert., ¶¶14, 16)

The other claim, the Arnold claim, concerned an employee who was gravely injured at a construction site when a stack of dry wall toppled over and struck him. ICA paid $1,007,842.57 for that claim, which is now closed, and will not likely generate any substantial additional payments. (Hirst Cert., ¶15)

The dispute between ICA and the First, Second and Third layer underwriters was essentially one of contract interpretation. The Underwriters claimed that the Treaties conditioned coverage on whether there were two claimants with injuries in excess of $750,000 *arising out of the same loss occurrence*, while ICA argued that the only condition for coverage was that there were two claimants with injuries in excess of $750,000 who were injured during the period covered by the Treaties. (Hirst Cert. at ¶¶19-20)

Although ICA has satisfied its obligations to its insureds and injured employees, and in Mr. Kringel's tragic case continues to meet them, the First and Second Layer Underwriters (i.e., those participating in Treaty 0274/04) refuse to pay their respective shares of those claims, and the underwriters participating in Treaty 0272/04 have anticipatorily breached their obligation to pay claims in the (highly likely) event that Mr. Kringel's paid loss will exceed $5,000,000. (Hirst Cert. ¶16)

Those breaches prompted ICA to demand arbitration on December 23, 2014. (Hirst Cert. at ¶¶16-17) The demand sought arbitration "pursuant to the arbitration

provision contained in Article 24 of that certain first and second layer reinsurance treaty brokered by Gresham Insurance Brokers Limited ("Gresham"), Agreement Number 0274/04, as extended and renewed ("Treaty") (as well as [in Article 24 of a third layer treaty contained in Agreement Number 0272/04, should the Claim rise to that level)." A true and correct copy of the Arbitration Demand is attached as Ex. C of the Hirsh Cert.

The Demand was sent via overnight mail to Mr. Clive Harris of Atrium Underwriters, the lead reinsurer with whom ICA had dealings on the claim, Gresham Insurance Brokers Limited, the London Broker designated by the Treaties' Intermediary Clauses to receive communications and notices on behalf of the underwriters on both Treaties, and Mr. Ted Davey of RFIB Group Limited, a licensed London-Market broker who had been engaged by Atrium to communicate with ICA concerning the reinsurance claims. (Hirst Cert., Ex. N at 2 of 7.)

ICA appointed Alex Campos as its party-appointed arbitrator, and on January 16, 2015, the Underwriters appointed Trevor Clegg as its party-appointed arbitrator. (Hirst Cert., Exs. C & P) The two party-appointed arbitrators appointed Ben F. Hernandez as the umpire. An organizational meeting was held on May 11, 2015 in the City of New York, Borough of Manhattan.

On October 5, 2015 through October 8, 2015 the Panel convened a four-day arbitration hearing, which also took place in Manhattan, and at which the Panel heard testimony and argument presented by both parties, which was recorded in a 1,049-page hearing transcript. (See Hirst Cert., Ex.D (copy of transcript in minuscript form)

At the hearing ICA was represented by John Magliery, Esq. of Johnson Gallagher Magliery LLC and the Underwriters were represented by Timothy Stalker,

9

Esq. of Weber, Gallagher, Simpson, Stapleton, Fires & Newby LLP. (Hirst Cert. at Ex.
E, Tr. at 1-4: 2) At the hearing, the Umpire, Mr. Hernandez, and ICA's party-appointed
arbitrator, Mr. Campos, asked questions concerning whether the relief ICA was
requesting would address what might happen should future payments on the Kringel
claim, combined with the approximately $4 million already paid, exceed $5,000,000,
and thus trigger the Third Layer Underwriters' obligations to reimburse ICA. (See Hirst
Cert., Ex. D, Tr. at 941-44: 941-44.) Mr. Magliery pointed out that ICA had demanded
arbitration under both Treaties, and that ICA was requesting declaratory relief
concerning the Third Layer Underwriters' obligation to pay in the event total payments
on the Kringel claim exceeded $5 million:

> MR. MAGLIERY:  Mr. Hernandez, we actually are [requesting relief to
> address expected future claim payments]. If you look at our demand for
> arbitration, we have demanded arbitration under treaties 0274 and
> 0272, the 5 to $10 million layer.   And the Underwriters, I take it, are
> defending that claim.  But we introduced the [0272] treaty in Mr. Hirst's
> direct, and we will expect a declaration that should the claim achieve
> that level, it will be paid.

(Hirst Cert. at Ex. D, Tr. at 941-42: 942.) The Underwriters' counsel agreed with ICA's
assessment of the situation:

> ·MR. STALKER: Correct. If you are successful, as you pay the claim, you
> would be reimbursed.
> MR. MAGLIERY: Mr. Stalker evidently has the same understanding.

(Id.)

On October 19, 2015, after hearing the parties' evidence and arguments, and
deliberating among themselves, the Panel rendered the Award, which it delivered to
the parties on October 21, 2015. (A copy of the Award is attached as Ex. E to the Hirst
Cert.)

The Award represented the Arbitrator's interpretation of the Treaties, which was

10

in accord with ICA's interpretation. It found the Underwriters participating in Treaty 0274/04 liable for, and granted to ICA damages of, $2,507,872.57 less an offset of $978,280.24 for reinstatement premium, which resulted in a net award of $1,529,592.30 (the "Damages"). (Award, Hirst Cert., Ex. E, at 2, ¶¶ 5 & 7)

The Award provided declaratory relief to ICA as respects the Underwriters participating in Treaty 0272/04: "[I]n the event that the Kringel claim exceeds $5,000,000, Underwriters shall pay losses submitted in excess of $5,000,000, through and including $7,500,000 (as limited by warranty I of Article 5 of the 0272/04 Treaty, which provides that the maximum claim per person shall not exceed $2,500,000)." (Award, Hirst Cert., Ex. E, at 2, ¶ 6)

The Award also provided for a reinstatement premium offset for the Treaty 0272/04 reinsurers: "the award for 0272/04 Treaty shall be offset (pursuant to Article 11 and Article 9) by reinstatement premium due of $487,500 (the "Reinstatement"), based upon the Kringel claim, should the Kringel claim reach full loss settlement[,]" and the Panel set forth its calculation of that reinstatement premium amount. (Award, Hirst Cert., Ex. E, at 2, ¶ 8)

The Award found Underwriters liable for, and granted to ICA, interest on the Treaty Damages at the annual rate of 4.5%, calculated daily from April 24, 2013 until paid. (Award, Hirst Cert., Ex. E, at 2, ¶ 9)

The Award stated that Underwriters should pay the Treaty Damages within forty-five days of October 19, 2015, i.e., by December 3, 2015.  The Underwriters have failed and refused to pay any portion of the Treaty Damages. (Hirst Cert. at ¶ 27)

On December 3, 2015, Locke Lord, the successor-in-interest of Lord, Bissell & Brook, a law firm who for many years has represented London Market Underwriters in

many claims disputes, arbitrations and litigations, advised the Panel and the parties for the first time that London Market Underwriters participating in Treaty 0272 did not receive "proper notice" of the Arbitration and that the Panel should therefore vacate the Award to the extent that it applies to those Third Layer Underwriters. (Hirst Cert., Ex. M) ICA's counsel responded to the letter to the Panel on January 8, 2016, and Locke Lord sent another letter in response to Mr. Magliery's letter on January 16, 2016. (Hirst Cert. Exs. N & O.)

Locke Lord's letters asserted, among other things, that the Faraday Syndicate, not the Atrium Syndicate was the lead underwriter on Treaty No. 0272/04, although it conceded that Atrium was the lead reinsurer on Treaty No. 0274/04. (Hirst Cert. at Ex. M at 2; Ex.O at 4-5.)  Locke Lord's first letter (Ex. M) failed to mention, among other things, that: (a) Atrium, which, Locke Lord said was, responsible for the conduct of the arbitration for Treaty 0274/04, was a following reinsurer, who also participated in Treaty 0272/04; and (b) Faraday, which, according to the Third Layer Underwriters (including Atrium), had to receive "proper" notice of the arbitration, was a following market participant in Treaty No. 0274/04, that is, the First and Second Layer Treaty that the Third Layer Underwriters concede was part of the arbitration. As of the time this brief was filed the Panel has not, to our knowledge, issued a ruling on the Third Layer Underwriters' request.

On January 14, 2016 the First and Second Layer Underwriters, represented by Mr. Stalker, filed a motion to vacate the Award, which it contends it served on January 15, 2016.  That motion is the subject of the related case, *Certain Underwriting Members of Lloyds of London v. Insurance Company of the Americas*, No. 1:16-cv-00323-VSB pending before this Court. The First and Second Layer Underwriters' are

seeking vacatur of the Award on the alleged evident partiality of Mr. Campos, ICA's party-appointed arbitrator; the Panel's alleged exceeding of its authority by adopting the ICA's interpretation of the contract rather than that of the underwriters; and the "misconduct" the Panel allegedly committed by denying it all the discovery it sought.

On January 18, 2016 the Third Layer Underwriters filed a motion to vacate the Award which it served on ICA's registered agent for service of process on January 19, 2016.

### ARGUMENT

### POINT I

### THE THIRD LAYER UNDERWRITERS HAD ACTUAL AND CONSTRUCTIVE NOTICE OF THE ARBITRATION PROCEEDINGS BECAUSE THE LEAD UNDERWRITERS OF BOTH TREATIES WERE PARTIES TO THE ARBITRATION

The Third Layer Underwriters' papers are replete with complaints about how they were allegedly not "properly served" with an arbitration demand or did not receive "proper notice" of the arbitration demand or the underlying claims. (See, e.g., Dk. 1, at 2, 6, 7 & 8.) But these contentions are beside the point in view of the controlling legal standard—which is *not formal* service, but simply notice that meets minimal due process standards. When those minimal standards are applied to the facts, the Third Layer Underwriters' motion is exposed as meritless.

### A.     Legal Standards

Section 10(a) of the Federal Arbitration Act permits vacatur on four exceedingly narrow grounds, specifically, where: (a) "the award was procured by corruption, fraud, or undue means" (9 U.S.C. § 10(a)(1)); (b) "there was evident partiality or corruption in" any of the arbitrators (9 U.S.C. § 10(a)(2)); (c) "the arbitrators were guilty of

13

misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced" (9 U.S.C. § 10(a)(3)); or (d) "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made" (9 U.S.C. § 10(a)(4)). The U.S. Supreme Court has held that these four, statutory grounds are exclusive in FAA-governed cases, and cannot be expanded by party agreement. *See Hall Street Assoc., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 578 (2008).

The FAA imposes a "strong presumption in favor of enforcing arbitration awards" under which an "award is [deemed] valid and unless it is proven otherwise." *Wall Street Associates, L.P. v. Becker Paribas Inc.,* 27 F.3d 845, 849 (2d Cir. 1994). Judicial review is "severely limited" "so as to not frustrate the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Scandinavian Re*, 668 F.3d at 71-72 (citations and quotations omitted). The challenger must prove that one of the grounds for vacatur exists and the burden is a "heavy" one. *Id.* (citations and quotation omitted)

Rejecting a claim that "award should be vacated because [the challenger] did not receive proper notice of the arbitration proceedings[,]" the Seventh Circuit observed that "'inadequate notice' is not one of . . . [Section 10's vacatur] grounds[,]" *Gingiss Intern., Inc. v. Bormet*, 58 F.3d 328, 332 (7th Cir. 1995). Article V(1)(b) of the Convention, however, provides that "[r]ecognition and enforcement of the award may be refused. . . if [the challenging] party furnishes to the competent authority where the recognition and enforcement is sought proof that: . . . (b) The party against whom the award is invoked was not given proper notice of the appointment of the

arbitrator or of the arbitration proceedings or was otherwise unable to present his case. . . ." Convention, Art. V(1)(b).

Whether or not the Third Layer Underwriters' "proper notice" defense is deemed to fall under Convention Article V(1)(b), or under Section 10(a)(3) (procedural misconduct) or 10(a)(4) (exceeding powers), it is a very narrow defense because, contrary to the Third Layer Underwriters' arguments made in its motion to vacate, the "improper notice" defense will not succeed unless a party has been saddled with an award arising from an arbitration about which it had no actual or constructive notice.

The Second Circuit has stated that Article V(1)(b) "essentially sanctions the application of the forum state's standards of due process. . . ." *Parsons & Whittemore Overseas Co., Inc. v. Societe Generale de L'Industrie du Papier (RAKTA)*, 508 F.2d 969, 975-76 (2d Cir.1974). This is a minimal, "fundamental fairness" or "fundamentally fair hearing" standard that is materially identical to the standard courts apply to challenges under Section 10(a)(3) for arbitral prejudicial "misconduct" or "misbehavior." *See, e.g.,* 9 U.S.C. § 10(a)(3); *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*, 729 F.3d 99, 104, 107 (2d Cir. 2013) (internal quotation marks omitted); *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak*, 364 F.3d 274, 298-99 (5th Cir., 2004); *Iran Aircraft Industries v. Avco Corp.*, 980 F.2d 141, 146 (2d Cir. 1992) ("We believe that by so misleading Avco [into thinking the panel did not want it to submit all invoices forming the basis of its claim], . . . the Tribunal denied Avco the opportunity to present its claim in a meaningful manner"); *Parsons*, 508 F.2d at 975 (panel was not required to "postpone the hearing as a matter of fundamental fairness" because key witness had prior speaking engagement that he would not cancel or reschedule).

To be "fundamentally fair," a hearing must satisfy "minimal requirements of fairness – adequate notice, a hearing on the evidence, and an impartial decision by the arbitrator." *Sunshine Mining Co. v. United Steelworkers*, 823 F.2d 1289, 1295 (9th Cir.1987). Put differently, the parties must have "the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quotation and citation omitted). This minimal due process standard is much less demanding than that applicable in litigation, which parties opt out of when they agree to arbitrate. *See, e.g., Karaha*, 364 F.3d at 299; *Parsons*, 508 F.2d at 975.

Due process does not in all circumstances require perfect or actual notice, constructive notice may suffice:

> "[a]n elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. The notice must be of such nature as reasonably to convey the required information, and it must afford a reasonable time for those interested to make their appearance. *But if with due regard for the practicalities and peculiarities of the case these conditions are reasonably met, the constitutional requirements are satisfied.*"
> (emphasis added; citations omitted)

*Mullane v. Cent. Hanover Bank & Trust Co.,* 339 U.S. 306, 314-15 (1950).

Parties can by contract specify what they consider to be adequate notice or waive notice altogether. *See, e.g., First State Ins. Co. v. Banco de Seguros Del Estado*, 254 F.3d 354, 357 (1st Cir. 2001) ("the method chosen by the parties to receive notice. . . cannot be deemed to offend due process."); *Employers Ins. of Wausau v. Banco Seguros de Estado*, 199 F.3d 937, 943 (7th Cir. 1999); *Gingiss*, 58 F.3d at 332 (The Bormets had no right under the franchise agreement to receive actual notice of the arbitration").

16

Emphasizing substance over form, courts, including the Second Circuit, have applied these minimal due process standards in Federal Arbitration Act cases to find notice of an arbitration proceeding need only be actual or constructive to be considered "proper" or adequate, even where the notice did not comply with the parties' agreement. *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Lecopulos*, 553 F.2d 842, 845 (2d Cir.1977) (because party agreed to arbitrate in New York, New York courts had personal jurisdiction over him to enforce arbitration agreement and "proper service of a demand for arbitration" was not required to "bring him within the power of the courts or arbitrators[]" where his attorneys received a motion to stay in favor of arbitration litigation plaintiff had commenced to obtain attachment of his property, which effectively notified him that plaintiff intended to arbitrate dispute; "[r]egardless of the precise legal status of Lecopulos's attorneys when they appeared in the district court, no unfairness results from giving effect to the notice they actually received.  .  . ."); *21st Century Financial Serv., L.L.C. v. Manchester Financial Bank*, 747 F.3d 331, 337-38 (5th Cir. 2014) ("Because the bank had actual or constructive notice and *Bernstein* requires no more, we do not need to decide whether 21st Century failed to comply with section 15.2 of the Agreement") (citing and discussing *Bernstein Seawell & Kove v. Bosarge*, 813 F.2d 726 (5th Cir.1987)); *Wasau*, 199 F.3d at 947 ("Wausau's motion to compel arbitration [served on agent for service of process] effectively gave Banco notice of arbitration proceedings" even though demand was not made via the contract's Intermediary Clause); *Smith v. Positive Products*, 419 F.Supp.2d 437, 446 (S.D.N.Y.2005)

Applying these standards to the facts demonstrates that the Third Layer Underwriters have wholly failed to satisfy their burden of proving that they had no

constructive or actual notice of the arbitration.

**B.    ICA Notified the Third Layer Underwriters, using the Treaties' Intermediary Clauses, which Required Notice to the Underwriters to be Sent to the London Broker**

By dispatching the Arbitration Demand to, among others, the reinsurance

intermediary, Gresham, ICA properly notified the Third Layer Underwriters in the

manner specified by the Third Layer Treaty, which satisfied ICA's notice obligation.

Both Treaties have identical loss notice provisions:

> The Reinsured shall advise the Underwriters promptly of all claims which in the opinion of the Reinsured may involve the Underwriters...  In the event of a claim arising hereunder, notice *shall be given to the Reinsurers through the Intermediary as specified in Article 27*.  .  .  .   (emphasis added)

(See Treaty 0274 at Art. 15., Hirst Cert., Ex. A; Treaty 0272 at Art. 15, Hirst Cert., Ex.

B)

Article 27 of both Treaties contains an Intermediary Clause, which

requires that "[a]ll communications (including but not limited to *notices*.  .  .)"

"be transmitted to.  .  .  the Underwriters through Gresham Insurance Brokers

Limited.  .  .":

> Gresham Insurance Brokers Limited is hereby recognized as the Intermediary negotiating this Agreement for all business hereunder.  All communications (including but not limited to notices, statements, premium, return premium, commissions, taxes, losses, loss adjustment expense, salvages and loss settlements) relating thereto shall be transmitted to the Reinsured or the Reinsurers through Gresham Insurance Brokers Limited, 65 Leadenhall Street, London EC3A 2DH. .  .  .  .

 (See Treaty 0274 at Art. 27; Hirst Cert., Ex. A; Treaty 0272 at Art. 27, Hirst Cert., Ex.

B)

Beginning with its first notice to Lloyd's in 2011, ICA has demonstrably

18

provided actual notice and constructive notice to the Third Layer Reinsurers of both its claims and this arbitration.  In 2011, a representative of ICA wrote to Helen Ashenden, identified as a Senior Claims Manager on the Lloyd's website, to notify Lloyd's of the likelihood that the claims would breach the reinsurance layers.  ICA sought Ms. Ashenden's help to identify "the correct contact person" at Lloyd's for submitting claims under the Treaties.  The email correspondence shows that ICA could only find Ted Davey's name initially but was able to provide Ms. Ashenden with a list of syndicate numbers for the First and Second Layer Treaty, including both Atrium (0570), and Faraday (0435) – the lead syndicate for the Third Layer Treaty. Given that Mr. Clive Harris, a representative of Atrium, next corresponded with ICA, it is reasonable to infer that, within Lloyd's, the ICA correspondence was forwarded to the Underwriters.  (A copy of the March 2011 email correspondence between ICA and Lloyd's is attached as Ex. C to Mr. Magliery's January 8, 2016 letter to the arbitration panel, Hirst Cert. ¶ 32, Ex. N.)

ICA continued to ask Underwriters to confirm whether ICA was communicating with the correct parties at Lloyd's in 2013, when a representative of ICA emailed Mr. Harris again with the loss amounts that had by that time fell within the limits of the First and Second Layer Treaty, stating: "If for some reason you are not the appropriate contact in this matter, please direct me to the appropriate party."  (A copy of the May 2013 email correspondence between ICA and Atrium is attached as Ex. D to Mr. Magliery's

January 8, 2016 letter to the arbitration panel, Hirst Cert. ¶ 32, Ex. N.) Mr.

Harris did not respond with any other points of contact for Underwriters.

ICA first notified the Third Layer Treaty Underwriters on January 31,

2014, that the First and Second Layer Treaty's indemnity obligations were

triggered by the two claims, one of which (Kringel) already exceeded $2 million;

that ICA demanded that the First and Second Layer Underwriters accept

coverage; and that ICA expected the Third Layer Underwriters likewise to

accept coverage for the claims under the Third Layer Treaty "should the Claim

rise to that level" (that is, above $5 million).  (See Hirst Cert. at ¶ 32, Ex. N at

Ex. C.) This notice complied with ICA's obligation to notify the Third Layer

Underwriters "of all claims which in the opinion of the Reinsured may involve

the Underwriters."  (See Third Layer Treaty, Art. 15, Hirst Cert. at Ex. B.)

ICA sent the January 31, 2014 letter not only to the Gresham address

specified in the Third Layer Treaty's Intermediary Clause, but also to Ted

Davey, the individual contact at Gresham who had negotiated the Treaties, at

his then-current employer's address, and also to Mr. Clive Harris at Atrium.

These three addresses constituted *every* point of contact that ICA had ever

been provided by the First, Second or Third Layer Underwriters, or by Lloyd's

itself, for communications concerning the Treaties.  (Hirst Cert. at Ex. N at 2 of

7)

ICA then transmitted its demand for arbitration in compliance with the

Third Layer Treaty's notice and Intermediary Clause provisions. On December

20

23, 2014, ICA wrote to the same three addresses to "demand arbitration with Certain Underwriting Members of Lloyd's. . . pursuant to the arbitration provision contained in Article 24 of [the First and Second Layer Treaty] (as well as [the Third Layer Treaty], should the Claim rise to that level) ...." (Hirst Cert., Ex. C)

Gresham, a licensed London Broker, was apparently out of business at the time the correspondence described above, including the Arbitration Demand, was dispatched. Neither the loss notice nor the arbitration demand were returned to ICA or its arbitration counsel. (Hirst Cert. at _____)

While we may never know who, if anyone, received the correspondence sent to Gresham, the contract required ICA to transmit it to that address, which it did. (See Third Layer Treaty, Article 23 (regarding Amendments and Alterations), Hirst Cert., Ex. B.) That was all the due process the contract required as respects such notices and arbitration demands. *See, e.g., First State*, 254 F.3d at 357; *Wausau,* 199 F.3d at 943; *Gingiss*, 58 F.3d at 332.

### C. The Lead Underwriters on Both Treaties had Actual or Constructive Notice of the Arbitration Demand and of the Arbitration Itself

Atrium was the lead underwriter for the First and Second Layer Treaties, but was also a following market reinsurer on the Third Layer Treaty. And Faraday, the lead underwriter on the Third Layer Treaty, was a following market reinsurer on the First and Second Layer Treaty.

The Third Layer Underwriters acknowledge that communication with the

lead—or even service of process on the lead—constitutes communication with, or service of, the rest of the reinsurers participating in a particular contract. (See, e.g., Dk 1 at 3.)  That means that notice to the lead is, under general principles of agency law, imputed to the other underwriters, whether or not the lead passes the information in question on to the rest of the Market. *See, e.g., Wausau*, 199 F.3d at 944.

Atrium received the Arbitration Demand, which means that Faraday, as a following market underwriter is deemed to have knowledge of the Arbitration. That knowledge presumably increased as the arbitration progressed through the hearings and ultimately, the Award.

Faraday, the lead on the Third Layer Treaty had actual or imputed knowledge that Atrium had, including the knowledge that losses on the Kringel Claim were projected to generate paid losses in an amount that would require the Third Layer Treaty to pay their respective shares of the loss.

### D.    The Third Layer Reinsurers Have No Defenses That Were Not Raised in the Arbitration.

The Third Layer Reinsurers contend that that they have been denied the opportunity to raise additional defenses that they purportedly would have raised had they not allegedly been denied "proper notice" or "proper service." They contend that they want to argue the issue that the Treaties provided cover only on a "clash" basis—i.e., at least two lives in excess of $750,000.00 *per occurrence*, which was what the whole arbitration was about in any event. They also claim that they would like to raise a so-called "sunset clause" argument

arising out of the commutation provision of the Third Layer Treaty. (Hirst Cert. Ex. B, Art. 16)

This assertion is misplaced because the First and Second Layer Treaty contains an *identical* commutation clause (also Article 16) that includes an *identical* sunset provision.  (Compare Hirst Cert. Ex. A, Art. 16 with Hirst Cert. Ex. B, Art. 16.) Moreover, the commutation clause and its sunset provision were thoroughly addressed at the arbitration hearing. (See Hirst Cert. Ex. D, Tr. at 941-944: 941-44; 1038-1041:1039:5 to 1042:4)

In any event, even were there arguments the Third Layer Reinsurers might assert with the benefit of 20-20 hindsight, they have only themselves to blame for not having raised them when they had the opportunity to do so,.

**E.    The Underwriters' Arguments About ICA Being Responsible for Replacing Gresham are Misplaced**

The Third Layer Underwriters contend that Gresham is or was solely ICA's agent, and thus it was ICA's obligation to replace Gresham. That assertion is misplaced for at least two reasons. First, while reinsurance intermediaries or brokers are, like direct insurance brokers, ordinarily agents of their cedents or insureds— particularly at the contract negotiation and formation stage--the precise scope of their agency depends on the facts and what the parties and the broker have agreed (and in some instances what the law provides).

First, under the Intermediary Clause, Gresham was the agent of the reinsurers for purposes of receiving notices and other communications from ICA. *See, e.g., Wausau*, 199 F.3d at 945.

Second, the Underwriters, as members of a market that requires the use of

23

Lloyds' brokers, s*ee, generally*, FIO Report, *supra*, at 4, Box 1, are better placed, and should have a better incentive to make, or at least propose, an alternative avenue of communication in situations where their own agent's quiet departure off the market can prevent them from receiving important communication that may affect their legal rights.

### F.   All of the Third Layer Reinsurers' Notice-Related Arguments are Misplaced because Faraday and Atrium had Actual or Imputed Knowledge of the Arbitration

The Third Layer Underwriters make a number of other assertions in their papers, ranging from unsupported and legally erroneous contentions about arbitration demands having to be served like summonses and complaints in litigation, to contending that Service of Suit Clauses – which, unlike Intermediary Clauses, were designed to facilitate service of *process*, not private arbitration demands. But these arguments are irrelevant. All that matters is that there was actual or constructive notice and here, as we've explained, there was plenty of that as well as compliance with contractually imposed requirements.

### G.   The Third Layer Reinsurers' Request for the Panel to Determine the Issue may Result in Further Delay Because the Third Layer Reinsurers have Made their Application to the Panel under a Reservation of Rights

While the Third Layer Underwriters have requested the arbitration panel to provide them relief, they have done so under a broad reservation of rights. (See Hirst Cert., Ex. M at 3.) Presumably they desire de novo review in the event the Panel rules against them. ICA points this out so that the Court will hopefully understand why ICA is reluctant to delay disposition of this matter.

**POINT II**

24

**THE THIRD LAYER REINSURERS' ARGUMENTS INCORPORATED BY REFERENCE FROM FIRST AND SECOND LAYER UNDERWRITERS' MOTION TO VACATE ICA I ARE UNAVAILING**

The Third Layer Reinsurers have purported to adopt in their entirety the arguments that the First and Second Layer Underwriters' motion to vacate makes in ICA 1, the related case pending before this court. In that case, the First and Second Layer Underwriters request the Court to vacate the Award on the ground of the alleged evident partiality of ICA's party appointed arbitrator, the arbitrators' alleged prejudicial misconduct and the arbitrators' alleged manifest disregard of the contract, which they allegedly committed by interpreting the contract in a way that the Underwriters did not want it to be interpreted.

Those arguments are being addressed in ICA 1 in papers that ICA has sought leave to file on February 26, 2016. and ICA thus respectfully requests the Court to deny the Third Layer Reinsurers' motion to vacate on those grounds for the same reasons on which ICA will respectfully request the Court to deny the First and Second Layer Underwriters' vacatur arguments.

25

## CONCLUSION

For all of the foregoing reasons, ICA respectfully requests that the Court deny the

Third Party Underwriters' motion to vacate and grant ICA's cross-motion to confirm.


Dated:   New York, New York
         February 19, 2016

                                    LOREE & LOREE

                          By: _____
                                    Philip J. Loree Jr. (PL-2213)
                                    830 Third Avenue
                                    Fifth Floor
                                    New York, New York 10022
                                    (646) 253-0560
                                    (516) 627-1720 (alternative
                                    phone no.)
                                    (516) 941-6094 (mobile)
                                    Fax: +1 (800) 627-3118
                                    PJL1@LoreeLawFirm.com

                                    ATTORNEYS FOR
                                    RESPONDENT INSURANCE
                                    COMPANY OF THE AMERICAS



To (Via ECF):

Joseph Nicholas Froehlich
Locke Lord LLP
200 Vesey Street
New York, NY 10281
(212) 415-8600
Email: jfroehlich@lockelord.com

ATTORNEYS FOR PETITIONER
CERTAIN UNDERWRITERS AT
LLOYD'S, LONDON SUBSCRIBING TO
TREATY NO. 0272/04