Joseph N. Froehlich (JF 5221)
LOCKE LORD LLP
200 Vesey Street, 20th Floor
New York, NY  10281-2101
(212) 415-8600
*Attorneys for Petitioners*
*Certain Underwriting Members at Lloyd's, London*
*Subscribing to Treaty No. 0272/04*


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
CERTAIN UNDERWRITING MEMBERS  AT       :
LLOYD'S OF LONDON,                                       :
                                                                            :
                                    Petitioners,            :         Index No. 1:16-CV-00323 (VSB)
                                                                            :
-v.-                                                                       :
                                                                            :
INSURANCE COMPANY OF THE AMERICAS,  :
                                                                            :
                                    Respondent.          :
                                                                            :
-----------------------------------------------------------X
CERTAIN UNDERWRITING MEMBERS AT       :
LLOYD'S, LONDON SUBSCRIBING TO          :
TREATY NO. 0272/04,                                     :
                                                                            :
                                    Petitioners,            :         Index No. 1:16-CV-00374 (VSB)
                                                                            :
-v.-                                                                       :
                                                                            :
INSURANCE COMPANY OF THE AMERICAS,  :
                                                                            :
                                    Respondent.          :
                                                                            :
-----------------------------------------------------------X

## REPLY MEMORANDUM OF PETITIONERS CERTAIN UNDERWRITING MEMBERS AT LLOYD'S, LONDON SUBSCRIBING TO TREATY NO. 0272/04 IN FURTHER SUPPORT OF THEIR MOTION TO VACATE OR MODIFY THE ARBITRATION AWARD

## TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................1

II.     ARGUMENT ..........................................................................................................2

        A.      The Panel Exceeded Its Powers By Ruling On Subject Matters Not
                Properly Before It ..................................................................................2

        B.      The Panel Exceeded Its Authority By Issuing An Award Against A
                Party Not Properly Before It Due To Lack Of Service Of The Arbitration
                Demand ..................................................................................................5

III.    CONCLUSION ....................................................................................................10

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>Cases</u>

*Atlanta Gas Light Co. v. Aetna Cas. and Surety Co.*,
   68 F.3d 409 (11th Cir. 1995) ............................................................... 3

*Employers Ins. of Wausau v. Banco De Seguros Del Estado*,
   199 F.3d 937 (7th Cir. 1999) ............................................................... 8

*Ins. Co. of the State of Pennsylvania v. Argonaut Ins. Co.*,
   2013 WL 4005109 (S.D.N.Y. Aug. 6, 2013) ........................................ 9

*Kaplan v. Dunhill, Inc.*,
   1996 WL 640901 (S.D.N.Y. Nov. 4, 1996) ........................................... 5

*Mason Tenders Dist. Council v. JNG Const. Ltd.*,
   2003 WL 22999453 (S.D.N.Y. Dec. 19, 2003) ................................... 10

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lecopulos*,
   553 F.2d 842 (2d Cir. 1977)................................................................. 8

*SEC v. Credit Bancorp., Ltd.*,
   147 F. Supp. 2d 238 (S.D.N.Y. 2001).............................................. 6, 8

*Smith v. Positive Prods.*,
   419 F. Supp. 2d 437 (S.D.N.Y. 2005).................................................. 8

*Travelers Indem. Co. v. Northrop Grumman Corp.*,
   4 F. Supp. 3d 599 (S.D.N.Y. 2014) ..................................................... 3

*21st Fin. Servs., L.L.C. v. Manchester Fin. Bank*,
   747 F.3d 331 (5th Cir. 2014) ............................................................... 8

*Unigard Sec. Ins. Co. v. N. River Ins. Co.*,
   4 F.3d 1049 (2d Cir. 1993).................................................................. 4

<u>Other Authorities</u>

B. Ostrager and M. Vyskocil, *Modern Reinsurance Law and Practice*, § 14.03
   (2d Ed. 2000) ...................................................................................... 6

Convention on the Recognition and Enforcement of Foreign Arbitral Awards ...................... 5, 6

Federal Arbitration Act, 9 U.S.C. §§ 10(a)(4) and 11(b)............................................... 2

G. Staring and D. Hansell, *Law of Reinsurance*, § 7.3 (2015 Ed.) .................................................. 7

F. Winston, Jr., et al., 1 *Law and Prac. of Ins. Coverage Litig.* § 10:20 ....................................... 3

## I.   __INTRODUCTION__

The instant evidence supporting vacatur of the arbitration award (the "Award") and, in turn, granting of the instant motion, is overwhelming. The arbitration panel (the "Panel") lacked any authority or jurisdiction to issue an Award on issues which were plainly not ripe for adjudication and against a party to whom service of the arbitration demand was never made. Respondent Insurance Company of the Americas ("ICA") is only permitted to initiate arbitration under the arbitration clause of the Treaty in the event there is "a dispute or difference of opinion" between the parties. Here, there was: (a) no notice by ICA to Petitioners Certain Underwriting Members at Lloyd's, London Subscribing to Treaty No. 0272/04 (the "Third-Layer Underwriters" or the "Third Layer") of the underlying claims at issue as required by the Treaty; (b) no resulting denial of coverage; and (c) no alleged losses which have ever implicated the Treaty's $5 million excess of $5 million layer. As such, there was a complete absence of any arbitrable "dispute or difference of opinion" or "justiciable controversy" between ICA and the Third-Layer Underwriters which would have triggered the Panel's authority to decide ICA's claim for declaratory relief.

Similarly, the Panel lacked authority or jurisdiction to issue an Award against the Third-Layer Underwriters because ICA failed to properly serve the arbitration demand upon them. As a result, they were deprived of any opportunity to, *inter alia*, object to arbitrability, agree upon a party-appointed arbitrator, determine the rules of procedure used during the arbitration, or raise any additional defenses unique to the Third Layer. Despite having at least four or five different service options available to it, including those contained in the Treaty provisions which plainly inured to its benefit, ICA inexplicably failed to properly invoke any of them and, instead, served the arbitration demand upon the wrong parties. In subsequent recognition of its now fatal error,

ICA desperately attempts to argue that it is not required to effectuate formal service of the arbitration demand, nor even comply with the "notice" obligations in the Treaty. Instead, according to ICA, only the Third Layer's "actual or constructive notice" of the arbitration proceedings is necessary in order to meet the purportedly "minimal" standards of due process and fundamental fairness. This is plainly not the standard, nor were the Third-Layer Underwriters ever provided with any such "notice". Indeed, under ICA's misguided theory, there would be no reason to ever serve an arbitration demand or comply with a contractual obligation, an ironic position given that ICA filed the instant arbitration seeking to enforce the terms of a reinsurance contract. ICA cannot have it both ways and, as such, the instant motion for vacatur should be granted.

## II.   ARGUMENT

### A.   The Panel Exceeded Its Powers By Ruling On Subject Matters Not Properly Before It.

The Court has grounds to vacate or modify the Award under the Federal Arbitration Act where, as here, "the arbitrators exceeded their powers" or "awarded upon a matter not submitted to them." 9 U.S.C. §§ 10(a)(4) and 11(b). The Panel's powers are largely derived from the arbitration clause in the Treaty, which provides, in relevant part: "As a condition precedent to any right of action hereunder, in the event of *any dispute or difference of opinion* hereafter arising with respect to this Agreement, it is hereby mutually agreed that such *dispute or difference of opinion* shall be submitted to arbitration." (*See* Mot. to Vacate, Broudy Cert. at Exh. A, Treaty, Art. 24 (emphasis added)). In this case, because it is undisputed that ICA initiated arbitration before *any* coverage position whatsoever was issued by the Third-Layer Underwriters, let alone any denial of coverage, there was clearly no "dispute or difference of opinion" empowering the Panel to render a decision against the Third-Layer Underwriters.

Similarly, given that ICA's sole claim against the Third-Layer Underwriters was for declaratory relief contingent upon the underlying Kringel claim implicating the Treaty's excess layer, there was no "justiciable controversy" authorizing the Panel to issue such an award. In the insurance context in particular, "[t]he general rule is that before a policyholder can file a declaratory judgment action against its insurer, the insurer must take a position regarding it duties under the insurance policies in question." Frank Winston, Jr., et al., 1 *Law and Prac. of Ins. Coverage Litig.* § 10:20 (2015) (citing *Atlanta Gas Light Co. v. Aetna Cas. & Sur. Co.*, 68 F.3d 409 (11th Cir. 1995)); *Travelers Indem. Co. v. Northrop Grumman Corp.*, 4 F. Supp. 3d 599, 607 (S.D.N.Y. 2014) (insurer's request for declaratory relief not ripe where insurer had not responded to tender of claim).

In this case, there was never any denial of coverage by the Third-Layer Underwriters because ICA never reported any of the underlying claims to them. Despite its suggestion that it notified "Lloyd's" in 2011 and 2013 of the underlying claims at issue, ICA admits that those efforts were directed only to the first and second layer underwriters comprising separate Treaty No. 0274/04 (the "First and Second Layer Underwriters"), and not the Third Layer.[1] Instead, it contends that ICA "first notified" the Third-Layer Underwriters by a letter from its former counsel dated January 31, 2014. (Opp. Br., p. 20.) Such communication hardly serves as a "notice of loss" letter, but rather was simply a response from ICA's former counsel to the First

---

[1] In 2010, ICA's former London broker, Gresham Insurance Brokers Limited ("Gresham"), became insolvent. In 2011, ICA, recognizing that notice on Gresham would be ineffective, contacted Helen Ashenden, a Senior Claims Manager at Lloyd's Performance Management, to identify the "correct contact person" to submit the underlying claims. (*See* Opp. Br., Hirst Cert at Ex. N.) As ICA's own exhibits demonstrate, ICA directed this request only to the First and Second Layers. Indeed, the entire e-mail chain, including the subsequent communication with Clive Harris of Atrium, only refers to the First and Second Layer Treaties and makes no mention whatsoever of the Third Layer Treaty. Atrium was the lead underwriter for the First and Second Layer Treaties, not the Third Layer. ICA's subsequent correspondence with Mr. Harris of Atrium in 2013 confirms that ICA had made the request for reimbursement only on the First and Second Layer Underwriters, because ICA requested $2,091,178.59 from the First and Second Layer Treaties only, an amount that falls well below the Third Layer Treaty's $5 million retention point. Again, nothing in the 2013 letter suggests ICA ever attempted to provide notice of the claim to the Third-Layer Underwriters. (*See id.*)

and Second Layer Underwriters' purported "unjustifiable denial" of coverage.  (*Id.*)  As with its subsequent arbitration demand, the letter makes only a single reference to the Third Layer (in parentheticals and a footnote) "should the Claim rise to that level," while devoting its balance exclusively to the coverage dispute between ICA and the First and Second Layer Underwriters, to which the Third Layer was not a party.  The letter also clearly lacks any explicit claims notification language.  In the reinsurance context, a notice of a claim should be sufficiently informative to enable a reinsurer to set proper reserves, to adjust premiums to reflect the loss experience under a treaty, and to determine whether to associate with the reinsured in the handling of the claim.  *See*, *e.g.*, *Unigard Sec. Ins. Co. v. N. River Ins. Co.*, 4 F.3d 1049, 1065 (2d Cir. 1993).  The January 2014 letter contains none of this information.  Additionally, as discussed below, the letter was addressed to the same wrong parties as in ICA's subsequent December 2014 arbitration demand.[2]

Further, it is quite telling that ICA's opposition brief is virtually devoid of any argument directly attempting to rebut the Third-Layer Underwriters' position that the Award should be vacated or modified because the Panel prematurely issued an Award not properly before it. Indeed, ICA does not contest that it made its arbitration demand contingent upon the underlying Kringel claim implicating the Third Layer.  ICA's claim for alleged damages, however, has not impacted the Third Layer.[3]  As such, the Panel lacked authority to decide this claim at this time.

---

[2] The January 2014 letter was addressed to the following recipients, none of whom acted on behalf of the Third Layer:  (1) the long-defunct Gresham; (2) Clive Harris of Atrium; and (3) Ted Davey at RFIB, a former Gresham employee who apparently acted as a liaison between ICA and Atrium with regard to ICA's coverage dispute with the First and Second Layer Underwriters.  (Opp. Br., p.20).

[3] Pivoting from its untenable "declaration award" claim, ICA has concocted a new cause of action never asserted before or in the arbitration – that the Third-Layer Underwriters have "anticipatorily breached" their "obligation to pay claims in the (highly likely) event that Mr. Kringel's paid loss will exceed $5,000,000."  (Opp. Br., p. 8).  These inaccurate and self-serving allegations aside, ICA has never provided the Third-Layer Underwriters with any notice, proof of loss amounts, actuarial studies or other documents which would support ICA's assertions.  Instead, the Third Layer has been handed an Award against it on a claim it had no opportunity to investigate or defend.

**B.     The Panel Exceeded Its Authority By Issuing An Award Against A Party Not Properly Before It Due To Lack Of Service Of The Arbitration Demand.**

In addition to ICA's improper maneuver in filing for arbitration against the Third-Layer Underwriters in the first instance, it failed to serve them with the arbitration demand.  New York courts have recognized that the lack of service of an arbitration demand and resulting deprivation of due process rights should result in vacatur of an arbitration award.  *See*, *e.g.*, *Kaplan v. Dunhill, Inc.*, No. 96-0258, 1996 WL 640901, *5 (S.D.N.Y. Nov. 4, 1996).  Further, as ICA acknowledges in its opposition, the defenses to confirmation of an award under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention") can also be invoked.  The Convention expressly recognizes that confirmation of an award should be denied if: " . . . (b) The party against whom the award is invoked was not given *proper notice* of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or . . . (d) The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties . . . ."  New York Convention at Art. V(1)(b) & (d). (emphasis added).

Here, ICA's arbitration demand letter requested the appointment of a party-appointed arbitrator within 30 days. (Opp. Br., Hirst Cert. at Exh. C.)  Because of ICA's failure to timely and properly serve the Third-Layer Underwriters, however, they never had the opportunity to agree to the selection of one.  Nor did they have the opportunity to agree to the procedures used during the arbitration process.  (*See* Mot. to Vacate, pp. 3, 6; Broudy Cert. at Exh. B, Lynch Aff., ¶¶ 8-9.)  Based on these reasons alone, in accordance with Article V(1)(b) and (d) of the Convention, the Award should not be enforced.

Indeed, there were a number of means available to ICA to facilitate service upon the Third-Layer Underwriters, including by:  (1) invoking the "Service of Suit" clause in the Treaty;

5

(2) amending the "Intermediary" clause in the Treaty to replace Gresham, the defunct intermediary identified therein; (3) otherwise hiring its own London broker to communicate with the Third-Layer Underwriters, as is customary and required in the London Market; and/or (4) directly serving the lead underwriter for the Third Layer, Faraday Syndicate 435 ("Faraday"),[4] and/or its designated agents.  Remarkably, ICA failed to invoke any of these options.  Nor did it serve each individual syndicate subscribing to the Treaty in accordance with the Hague Convention.

ICA devotes only a single sentence to the Third-Layer Underwriters' argument that ICA should have used the "Service of Suit" clause to serve the Underwriters through designated agents for service of process (namely, the Lord Bissell & Brook/Locke Lord law firm or the New York Insurance Commissioner), suggesting that it only applies in a lawsuit situation.  To the contrary, where, as here, there is no contractual or statutory provision prescribing a method of service, "a cedent demanding arbitration should look to the service of suit clause, which frequently appear in contracts with foreign reinsurers."  *See* B. Ostrager and M. Vyskocil, *Modern Reinsurance Law and Practice*, § 14.03[a] (2d Ed. 2000).

Service of an arbitration demand "can also be attempted through delivery to the reinsurance intermediary."  *Id*.  Here, while ICA acknowledges that Gresham was defunct, it conveniently neglects to mention that it *knew* Gresham was defunct for *three years* before it issued the arbitration demand to it. (*See* Opp. Br., p. 19-21.)  Nevertheless, ICA, straining credulity, still attempts to argue that service on Gresham was somehow effective.  In so doing, ICA attempts to shift the blame to the Third-Layer Underwriters for not replacing Gresham.  ICA claims, without support, that Gresham was ICA's agent for reinsurance placement purposes, but

---

[4] "In the London Insurance market, a lead underwriter sets the terms of the policy and premiums, and is responsible for the administration of the policies, including the addition of endorsements or modifications to the policy and claims handling."  *SEC v. Credit Bancorp, Ltd.*, 147 F. Supp. 2d 238, 242 (S.D.N.Y. 2001).

an agent of the Underwriters for claims notification purposes.  It is well-established, however, that "[t]he broker is, of course, also the agent of the insurer in presenting a claim against the reinsurer . . . ."  *See* G. Staring and D. Hansell, *Law of Reinsurance*, § 7.3 (2015 Ed.).  Moreover, since ICA was the party attempting to effectuate service of its arbitration demand by invoking that clause, the burden fell squarely on ICA to amend it and otherwise designate a new intermediary.  Indeed, ICA acknowledges that in the London Market brokers are "required" to be used, yet it inexplicably failed to retain one after it became aware of Gresham's insolvency.  (Opp. Br., p. 23-24.)  Had ICA, a sophisticated insurer with ample resources, simply used a broker to present the arbitration demand to the Third Layer (assuming ICA even intended to do so), the parties would likely not find themselves in the predicament they are in today.[5]

As for the arbitration demand itself, it is clear that Faraday was not listed as an addressee. (Opp. Br., Hirst Cert. at Exh. C.)  Nor were Lord Bissell/Locke Lord or any state insurance commissioner.  Instead, ICA addressed its demand to Gresham, and the same individuals it had been dealing with in connection with the coverage issues involving the first two reinsurance layers:  (1) Clive Harris of Atrium; and (2) Ted Davey of RFIB, neither of whom were authorized by Faraday to accept service of the demand on behalf of the Third Layer.[6]  (Mot. to Vacate, pp. 5-6.)

Recognizing its myriad of service and notice errors, ICA attempts to conduct an end run around its contractual obligations, London Market custom and practice and applicable New York law by claiming that it need not comply with any "formalistic service of process requirements",

---

[5] Under London Market custom and practice, communications about a claim should take place between the reinsured and a Lloyd's broker, who is then required to present the claim to the lead underwriter, at all relevant times, through the Electronic Claims File (ECF) system.  (*See* Motion to Vacate, Broudy Decl. at Exh. A, Faraday Aff. at ¶ 4.)

[6] While there is a dispute between the First and Second Underwriters and ICA as to his agency status, ICA contends that Davey is a "licensed London-Market broker who had been engaged *by Atrium* to communicate with ICA concerning the reinsurance claims."  (*See* Opp. Br., p. 9.)

nor "even compliance with agreed notice procedure . . ." (Opp. Br., pp. 4, 13.) Instead, according to ICA, only the Third Layer's "actual or constructive notice" of the arbitration proceedings at some point is necessary in order to meet purportedly "minimal" due process standards. In so doing, ICA essentially contends that service/notice of the arbitration demand on Atrium, as lead for the First and Second Layers, should be imputed to Faraday since it participated in the "following market" on those layers. Because Faraday purportedly had "actual or imputed knowledge" of the arbitration, such alleged knowledge should then somehow be imputed to the rest of the Third Layer market. There is no legal or factual support for ICA's position. Indeed, the cases on which ICA's relies in support of "constructive or imputed" notice actually support the Third-Layer Underwriters' position. These cases each involve service of an agent of the proper party, whereas here, ICA simply served the wrong parties, none of whom were agents of Faraday or the Third Layer.[7]

ICA's reliance on "constructive" notice also ignores the nature of the Lloyd's subscription market. Faraday's participation on the lower layers as a member of the "following market" should not be equated with a typical individual defendant or party who plays an active role in litigation, as ICA suggests here. Members of the following market (*i.e.*, the non-lead Lloyd's syndicates subscribing to a treaty) "tend to rely on the underwriting, administration and claims handling of the leader." *SEC v. Credit Bancorp, Ltd.*, 147 F. Supp. 2d 238, 242 (S.D.N.Y. 2001). Here, unlike when it acts as a lead, Faraday had a relatively small percentage of the risk on the lower layers (13%); was not an "agreement party"; and otherwise played no

---

[7] *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Lecopulos*, 553 F.2d 842 (2d Cir. 1977) (service of arbitration demand on parties' attorney); *Employers Ins. of Wausau v. Banco De Seguros Del Estado*, 199 F.3d 937 (7th Cir. 1999) (service on designated agent for service of process); *21st Fin. Servs., L.L.C. v. Manchester Fin. Bank*, 747 F.3d 331, 334 (5th Cir. 2014) (service of designated attorney of motion to stay litigation in favor of arbitration); *Smith v. Positive Prods.*, 419 F. Supp. 2d 437, 445 (S.D.N.Y. 2005) (service on agent).

role in agreeing to the arbitrator, counsel, or any strategy in the arbitration. (*See* Mot. to Vacate, pp. 3, 6; Broudy Cert. at Exh. B, Lynch Aff., ¶¶ 8-9.) Other Third-Layer Underwriters had no involvement whatsoever in the First and Second Layer Treaties. To adopt ICA's bald assertion that service on Atrium under one reinsurance contract would somehow bind Faraday and these other underwriters under a separate contract would turn due process and fundamental fairness on their head.

ICA's argument also incorrectly presumes that Faraday, as a following market participant, would automatically know that it also participated on the separate Third-Layer Treaty. Indeed, Faraday never received notice of the claims at issue or service of the arbitration demand under the Treaty, nor is there any evidence that ICA previously asserted any other claims under it. Pursuant to New York law, notice of a claim or arbitration on one contract does not trigger any obligation on any insurer/reinsurer to conduct a search on its system to determine whether it has a percentage share on a separate contract that might be implicated. *See, e.g., Ins. Co. of the State of Pennsylvania v. Argonaut Ins. Co.*, No. 12 CIV. 6494 DLC (ICSOP), 2013 WL 4005109, at \*10 (S.D.N.Y. Aug. 6, 2013). It is precisely this type of "constructive notice" argument requiring an insurance company to "connect the dots" that New York courts disfavor. *Id*. Instead, New York courts require the insured/reinsured to comply with its contractual obligations to provide *direct* notice to or service upon its reinsurers, which ICA plainly failed to do here. *Id*.

Lastly, ICA's contention that the Third-Layer Underwriters were somehow not prejudiced by their absence because they have no defenses that were not raised at the arbitration is incorrect and misleading.[8] In so doing, ICA conveniently ignores the Third Layer's defense

---

[8] ICA also attempts to create the "fiction" that the Third-Layer Underwriters somehow participated at the hearing by the alleged representation of outside counsel for the first two layers, Timothy Stalker. ICA relies on its

relating to the lack of proper notice to the Treaty of the claims at issue.  ICA also incorrectly contends that the Third Layer simply wanted to make the same arguments on the merits as the lower layers when, in truth, they wanted the opportunity to provide additional evidence unique to the Third Layer.  Moreover, despite ICA's suggestion to the contrary, the Third-Layer Underwriters' defense regarding the expiration of the 84-month sunset clause in the commutation clause, which operates as a bar to any recovery by ICA, is markedly different from the lower layers.  While the first two layers may or may not have received timely notice of the underlying losses back in 2011, the Third Layer never received any proper notice.  Even ICA's claimed "first notice" to the Treaty in January 2014 (which the Third Layer disputes) came well after the expiration of the 84-month sunset provision.

## III.   CONCLUSION

For the foregoing reasons, as well as the reasons set forth in their opening petition and motion, the Third-Layer Underwriters respectfully request that the Court grant their motion to vacate or modify the Award.

Dated:  New York, New York            LOCKE LORD LLP

March 18, 2016                 s/ Joseph N. Froehlich
                    (JF 5221)
                    LOCKE LORD LLP
                    200 Vesey Street, 20th Floor
                    New York, NY  10281-2101
                    (212) 415-8600
                    *Attorneys for Petitioners*
                    *Certain Underwriting Members at Lloyd's, London Subscribing to Treaty No. 0272/04*

---

characterization of the single word "Correct" that Mr. Stalker made in response to an issue relating to the Treaty to show that he represented the Third Layer.  (Opp. Br., p. 10.)  It is telling that ICA was unable to proffer more than this paltry characterization.  Moreover, ICA completely ignores the fact that Mr. Stalker was never retained by the Third-Layer Underwriters.  ICA's opposition makes no effort to contest that Mr. Stalker has no authority in the absence of any statements or conduct attributable to Faraday indicating that he represented the Third Layer.  *Mason Tenders Dist. Council v. JNG Const. Ltd.*, No. 00 CV 1032 GBD, 2003 WL 22999453, at *4 (S.D.N.Y. Dec. 19, 2003).