UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
CERTAIN UNDERWRITING MEMBERS AT LLOYDS OF
LONDON,

                Petitioner,                    16-CV-323 (VSB)

-v.-

INSURANCE COMPANY OF THE AMERICAS,

                Respondent.


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
CERTAIN UNDERWRITING MEMBERS AT LLOYDS,
LONDON SUBSCRIBING TO TREATY NO. 0272/04


                Petitioner,                    16-CV-374 (VSB)

-v.-

INSURANCE COMPANY OF THE AMERICAS,

                Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**INSURANCE COMPANY OF THE AMERICAS' MEMORANDUM OF LAW IN
OPPOSITION TO IPA ACQUISITIONS, INC.'S MOTION TO INTERVENE**



                            Philip J. Loree Jr. (PL-2213)
                            LOREE & LOREE
                            830 Third Avenue
                            Fifth Floor
                            New York, New York 10022
                            (646) 253-0560
                            (516) 627-1720 (alt. phone)
                            PJL1@LoreeLawFirm.com

                            ATTORNEYS FOR RESPONDENT
                            INSURANCE COMPANY OF THE AMERICAS

## Table of Authorities

**Cases**

*Floyd v. City of N.Y.*, 770 F.3d 1051, 1057 (2d Cir. 2014)...........................................18

*Gilbert Frank Corp. v. Federal Ins. Co.*, 70 N.Y.2d 966, 525 N.Y.S.2d 793, 520 N.E.2d 512 (N.Y., 1988) ........................................................................................21

*Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 588 (2008) ................................22

*Jones v. Sun Bank/Miami, N.A.*, 609 So.2d 98, 03 (Fla. App. 3rd Dist.) ......................19

*MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 390 (2d Cir. 2006)...19

*Washington Elec. Co-op., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*....................18

**Statutes**

18 U.S.C. § 1033(e)(1)(A) ...........................................................................................15

18 U.S.C. § 1033(e)(l)(B) .............................................................................................7

Fla. Stat. § 95.11(3)(f) & 3(p) ....................................................................................19

Fla. Stat. 628.461 .........................................................................................................6

**Rules**

Fed. R. Civ. P. 19(a) ...................................................................................................23

Fed. R. Civ. P. 9(b) .....................................................................................................11

Fed.R.Civ.P. 24(a)(2) ..................................................................................................18

Second Circuit Local R. 42.1 .......................................................................................12

**Regulations**

11 NYCRR § 126.1 et seq. (a/k/a "Regulation 114") ..................................................10

# Table of Contents

INTRODUCTION AND PRELIMINARY STATEMENT ..................................................... 1

FACTS AND PROCEDURAL HISTORY ....................................................................... 3

    A.    The Florida Insurance Regulators Determine in 2008 that IPA's and Mr. Kernan's Continued Ownership and Management of ICA would Endanger ICA's Policyholders. ................................................................................................. 3

    B.    The Florida Insurance Regulators ask a Florida State Court to Place ICA in Receivership. ..................................................................................................... 3

    C.    First Florida Equity Holdings, Inc. ("First Florida") Agrees with IPA to Purchase 100% of ICA's Common Stock. ............................................................ 5

    D.    First Florida's Willingness to Enter into an SPA Persuaded the Florida Insurance Regulators to Stay the Receivership Proceedings Because the SPA would, if Approved, would divest Kernan and IPA from any Ownership or Control of IPA. ................................................................................................................. 6

    E.    In March 2009 the Florida Insurance Regulators Approve the Application to Permit First Florida to Purchase 100% of IPA's Ownership Interest in ICA ............ 6

    F.    Kernan and IPA attempt to Thwart the Timely Closing of the SPA................... 7

    G.    James Kernan is Convicted of a Felony Related to Insurance Fraud ............ 7

    H.    Kernan's and IPA's Foot-Dragging on Closing the Approved SPA, coupled with the News of Kernan's Recent Conviction, and Kernan's Continued Involvement in ICA's Management, Prompts the Florida Insurance Regulators to File for an Amended Order to Show Cause to Place ICA in Receivership................ 8

    I.    IPA and Kernan Capitulate, Apparently Realizing that Further Efforts to Retain Ownership and Control of ICA would Result in ICA Being Placed into Receivership 9

    J.    Kernan and IPA Bring Actions Against ICA in the Supreme Court, Oneida County and in the Northern District of New York ................................................ 10

    K.    Kernan Sues New York's Insurance Regulatory Authorities and Loses ....... 12

    L.    Kernan Brings a Federal Class Action Law Suit against the U.S. Government and Various New York, Florida and Illinois Officials and Agencies, including the Florida Regulatory Authorities ........................................................................... 14

    M.    IPA Moves to Intervene in this Federal Arbitration Act Proceeding ............. 17

ARGUMENT .......................................................................................................... 18

POINT I .................................................................................................................. 18

THE MOTION TO INTERVENE IS UNTIMELY............................................................ 18

POINT II ................................................................................................................. 23

THE COURT SHOULD DENY INTERVENTION BECAUSE IPA LACKS THE REQUISITE SUBSTANTIAL, DIRECT AND LEGALLY COGNIZABLE INTEREST IN THE SUBJECT MATTER .................................................................................................................. 23

CONCLUSION........................................................................................................ 24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
CERTAIN UNDERWRITING MEMBERS AT LLOYDS OF
LONDON,

                              Petitioner,

                                                      16-CV-323 (VSB)

-v.-

INSURANCE COMPANY OF THE AMERICAS,

                      Respondent.


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CERTAIN UNDERWRITING MEMBERS AT LLOYDS,
LONDON SUBSCRIBING TO TREATY NO. 0272/04

                              Petitioner,                 16-CV-374 (VSB)

-v.-

INSURANCE COMPANY OF THE AMERICAS,

                      Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**INSURANCE COMPANY OF THE AMERICAS' MEMORANDUM OF LAW IN
OPPOSITION TO IPA ACQUISITIONS, INC.'S MOTION TO INTERVENE**

**INTRODUCTION AND PRELIMINARY STATEMENT**

Respondent Insurance Company of the Americas ("ICA") respectfully submits

this memorandum of law in opposition to IPA Acquisitions, Inc. ("IPA")'s motion,

pursuant to Fed. R. Civ. P. 24(a)(2), to intervene as a matter of right. The Court should

deny the motion because, among other things:

1. Based on IPA's own submissions, the claims it would attempt to make in this case are untimely as a matter of law. They were barred long-ago by Florida's four-year statute of limitations, and would likewise be barred by New York's statute of limitations, irrespective of whether the applicable limitations period is three years (New York Civ. Prac. L. & R. ("CPLR") § 214(2) or six-years (CPLR § 213(2)).

2. IPA offers no legitimate explanation for its many-month delay in seeking intervention, let alone its seven-year delay in requesting any court to adjudicate its claims, which purport to challenge the Florida Office of Insurance Regulation (the "Florida Insurance Regulators")'s 2009 approval of Florida Equity Holdings, Inc. ("First Florida")'s agreement with IPA to purchase 100% of ICA's outstanding common stock;

3. IPA does not have the requisite interest in the subject matter of this action to obtain intervention as a matter of right under Fed. R. Civ. P. 24(a)(2) (or even permissive intervention under Fed. Civ. P. 24(b));

4. The Court's disposition of the competing motions to confirm or vacate the arbitration award (the "Award") in this proceeding will not impair or impede any interest alleged by IPA;

5. IPA—a stranger to these proceedings and to the parties' arbitration agreement: (a) requests this Court to resolve claims that are created by Florida statute, which directs that they be asserted before a Florida state court sitting in Broward County, Florida; (b) seeks equitable relief in the form of an injunction and accounting; and (c) without citing any authority

seeks to join as a party Gary T. Hirst, ICA's Chairman, Director and Chief Investment Officer;

6. Granting the motion to intervene would undermine the purposes and objectives of the FAA because it will delay what is supposed to be prompt resolution of issues concerning the enforcement of the award;

7. Granting the motion to intervene would cause prejudice to ICA, which will effectively be denied the principal benefit of having chosen reinsurance arbitration over court litigation, which is the speedy and informal resolution of disputes by specialist decision makers selected by or with the consent of the parties;

## FACTS AND PROCEDURAL HISTORY

### A. The Florida Insurance Regulators Determine in 2008 that IPA's and Mr. Kernan's Continued Ownership and Management of ICA would Endanger ICA's Policyholders.

During the period from at least January, 2008 until July, 2008, the Florida Financial Services Commission's Office of Insurance Regulation (the "Florida Insurance Regulators") discovered that ICA was having significant financial difficulties, was engaged in prohibited market conduct and that Mr. Kernan, the owner of ICA's parent company, IPA, was engaged in unlawful conduct that Florida's Insurance Regulators concluded was endangering ICA's policyholders.

### B. The Florida Insurance Regulators ask a Florida State Court to Place ICA in Receivership.

As a result, in July 2008, Florida's Insurance Regulators petitioned the Leon County Florida Circuit Court for an order to show cause why ICA should not be placed in receivership for rehabilitation. (Loree Cert., Ex. A -043-47) In support of the Petition, Robin S. Westcott, Director of Property and Casualty Financial Oversight for

3

the Florida Office of Insurance Regulation, submitted an affidavit, sworn to July 2, 2008, which explained:

- ICA was 100% owned by [IPA], a California corporation 100% owned by James M. Kernan.  In addition to ICA, through IPA and other holding companies, Mr. Kernan also owned Oriska Insurance Company ("Oriska"), a New York domiciled insurance company, and two Illinois insurance companies.

- Ms. Westcott stated that on January 30, 2008, an indictment was filed in the United States District Court for the Northern District of New York charging Mr. Kernan with the transaction of fraudulent insurance business through Oriska, of allowing a banned person to participate in his insurance business, and of making false statements to insurance regulators.

- Ms. Westcott stated that an examination of ICA by [the Florida Insurance Regulators] showed that ICA maintained an undisclosed claims paying account that was not reported in the financial statements, and therefore not reported to [the Florida Insurance Regulators]. A market conduct examination showed that ICA was not in compliance with a 2005 Consent Order regarding its collateral accounts.

- Ms. Westcott stated that events relating to Mr. Kernan caused the [the Florida Insurance Regulators] to have a reasonable belief that ICA has been the victim of fraud affecting it, or other illegal conduct in, by, or with respect to it.

- Ms. Westcott stated that based on the above, [the Florida Insurance Regulators] had commenced another examination of ICA, but in violation of Florida Statutes, ICA refused to provide all documentation regarding its parent IPA, and refused to confirm that information provided regarding outstanding claims liabilities was complete.  [the Florida Insurance Regulators] also discovered that ICA had paid an unauthorized dividend of $1,658,890 to IPA in the fourth quarter of 2007, in clear violation of Florida Statutes.

- Ms. Westcott also stated that ICA had provided a purportedly independent credit risk analysis to [the Florida Insurance Regulators].  It was not disclosed to [the Florida Insurance Regulators] that the report was prepared by a company of which the President of ICA was also President.

(Loree Cert., Ex. A 0053-63)

4

On July 11, 2008, the Court, finding that the Florida Insurance Regulator's had established a prima facie case for placing ICA in receivership, and ordered that ICA show cause why a receiver for rehabilitation should not be appointed. (Loree Cert., Ex. Ex. A at 043-47) A hearing was set for September 3, 2008. (Loree Cert., Ex.A at 043-44)

The statutory grounds invoked by the Florida Insurance Regulators for the Order were that:

- That Respondent is in such condition, or is using or has been subject to such methods or practices in the conduct of its business, as to render its further transaction of insurance presently or prospectively hazardous to its policyholders, creditors, stockholders, or the public pursuant to Section 631.051(3), Florida Statutes;

- That Respondent has willfully failed to submit documents of the insurer to the reasonable inspection or examination of the Florida Office of Insurance Regulation and is subject to rehabilitation pursuant to Section 631.051(4), Florida Statutes;

- That Respondent has transferred or attempted to transfer substantially its entire property or business, or has entered into any transaction the effect of which is to merge substantially its entire property or business into that of any other insurer or entity without having first obtained the written approval of the Florida Office of Insurance Regulation and is subject to rehabilitation pursuant to Section 631.051(7), Florida Statutes; and

- That Respondent has willfully violated the law(s) of the state and is subject to rehabilitation pursuant to Section 631.0S 1(8), Florida Statutes.

(See Loree Cert., Ex. A at 043-44.)

### C. First Florida Equity Holdings, Inc. ("First Florida") Agrees with IPA to Purchase 100% of ICA's Common Stock.

First Florida and IPA subsequently entered into a Class A Common Stock Purchase Agreement ("SPA"), which they executed on October 31, 2008. Under the SPA, First Florida would, upon the closing date, acquire from IPA one-hundred percent (100%) of the outstanding common stock of ICA. (Loree Cert., Ex. B) To become

5

effective, the SPA had to be reviewed and the purchaser, First Florida, and its owners and management would have to be approved by the Florida Insurance Regulators.

### D. First Florida's Willingness to Enter into an SPA Persuaded the Florida Insurance Regulators to Stay the Receivership Proceedings Because the SPA would, if Approved, would divest Kernan and IPA from any Ownership or Control of IPA.

The execution of the SPA gave IPA a respite from having the Florida Insurance Regulators prosecute the state receivership case against them, because the Florida Insurance Regulators agreed to shift their main focus from the misconduct perpetrated by ICA and Kernan to analyzing First Florida's suitability and qualifications to be ICA's holding company (i.e., ICA's parent company, which would own and control 100% of ICA's common stock) as required by Fla. Stat. 628.461. (See Loree Cert., Ex. A at 53-54.)

Accordingly, the receivership proceedings were stayed pending the Florida Insurance Regulators' approval of the SPA, and the closing of the SPA, once approved. And to that end, on March 9, 2009, First Florida and IPA amended the SPA by extending the originally-agreed closing date to April 6, 2009.

### E. In March 2009 the Florida Insurance Regulators Approve the Application to Permit First Florida to Purchase 100% of IPA's Ownership Interest in ICA

First Florida satisfied the statutory application process requirements of Section 628.461, Florida Statutes, and on March 25, 2009 the Florida Insurance Regulators made an "Order Approving Acquisition," which approved an application "by [First Florida] to acquire 100% of the Common Stock of [ICA], a company wholly owned by [IPA], whose common stock is wholly owned by James M. Kernan." (Loree Cert., Ex. B)

6

The Florida Insurance Regulators' order prohibited First Florida and ICA from having any business dealings with Mr. Kernan, ICA, Mr. Anderson, or any entity affiliated or related to either of them:

> APPLICANT and/or INSURANCE AMERICAS shall not enter into any agreements with Robert J, Anderson, James M. Kernan, or any entity affiliated and/or related to Robert J. Anderson or James M. Kernan. Further, APPLICANT and/or INSURANCE AMERICAS shall not allow Robert J. Anderson, James M. Kernan, or any entity affiliated and/or related to Robert J. Anderson or James M. Kernan to exercise any control, directly or indirectly, over the activity of APPLICANT and/or INSURANCE AMERICAS.

(Loree Cert., Ex. B at 11 of 13)

The order provided that it would become void if First Florida and IPA did not close the SPA within 120 days after March 25, 2009 (i.e., by July 25, 2009). (Loree Cert., Ex. B at 12 of 13)

### F. Kernan and IPA attempt to Thwart the Timely Closing of the SPA

Once the Florida Insurance Regulators approved the transaction on March 25, 2009, Kernan and IPA took no further action to go forward with the closing. (Loree Cert., Ex. A at 2 of 3)

### G. James Kernan is Convicted of a Felony Related to Insurance Fraud

On March 20, 2009, James Kernan plead guilty to having violated 18 U.S.C. § 1033(e)(l)(B) by "knowingly and willfully permitting a convicted felon to be engaged in the business of insurance. . . ." (Loree Cert., Ex. A at 064-74) That charge arose out of Mr. Kernan's employment of Robert I. "Skip" Anderson" as the Oriska Insurance Company's Director of Operations, where Anderson engaged in marketing, underwriting and collection activities. (Loree Cert., Ex A at 064-74)

**H. Kernan's and IPA's Foot-Dragging on Closing the Approved SPA, coupled with the News of Kernan's Recent Conviction, and Kernan's Continued Involvement in ICA's Management, Prompts the Florida Insurance Regulators to File for an Amended Order to Show Cause to Place ICA in Receivership**

As of May 15, 2009, IPA had not closed the SPA, and that, in conjunction with Kernan's conviction, and evidence received by the Florida Insurance Regulators showing Kernan's continued involvement in ICA's business affairs, prompted the Florida Insurance Regulators to petition for an amended order to show cause why a receiver for rehabilitation should not be appointed for ICA. (Loree Cert., Ex. A at 034-35)

Also as May 15, 2009 ICA filed a stipulation allowing the Florida Insurance Regulators until May 20, 2009 in the event that the SPA did not close by May 18, 2009:

> ICA understands that its parent company and sole shareholder, IPA ACQUISITIONS, INC. ("IPA"), has agreed to close the Stock Purchase Agreement dated October 31, 2008 ("SPA") which it entered with First Florida Equity Holdings, Inc. ("First Florida"). First Florida is the buyer which the Office of Insurance Regulation approved pursuant to the Order Approving Acquisition issued on March 25, 2009.
>
> If for any reason the closing does not occur on May 18, 2009, ICA hereby consents to an extension until May 20, 2009, for the State to file its petition for Amended Order to Show Cause …

(Loree Cert., Ex. A at 080-81)

But IPA did not close by May 18, 2009, and rather than wait until May 20, 2009 to seek an order to show cause, the Florida Insurance Regulators immediately filed for an Amended Order to Show Cause why ICA should not be placed into receivership for rehabilitation. (Loree Cert., Ex. A at 036-42) The Florida Insurance Regulators added an additional ground for appointing a receiver, namely, that Mr. Kernan continued to secretly run the business of ICA and to direct the transfer of

8

funds between banks, all in violation of Florida Statutes. A hearing was set for June 16, 2009. (Loree Cert., Ex. A at 081) )

> **I.   IPA and Kernan Capitulate, Apparently Realizing that Further Efforts to Retain Ownership and Control of ICA would Result in ICA Being Placed into Receivership**

On May 20, 2009, IPA and Kernan finally appeared ready to accept the inevitable, and closed on the Court-approved SPA, which vested ownership and control of ICA in First Florida, where it remains today. (Loree Cert., Ex. A at 004)

In light of the closing, on May 21, 2009, the Florida Insurance Regulators filed a Motion to Dismiss Order to Show Cause in the receivership action.  The petition stated that:

- The Department previously petitioned the Court for Order to Show Cause and the Order was entered on July 10, 2008. … Additionally, the Department petitioned the Court for an Amended Order to Show Cause and the Order was entered on May 19, 2009.

- The Department and Respondent agreed to a stay of the proceedings under the Order to Show Cause to allow for a proposed sale of the Respondent which would in effect moot the need for a receivership.

- The Florida Office of Insurance Regulation (hereinafter the "Office") agreed to consider an acquisition by First Florida Equity Holdings, Inc. (hereinafter "FFEHI") of the Respondent in order for current management to divest themselves of the company. After approval of FFEHI as a buyer and closure of the sale transaction, the Office would recommend that the receivership action be dismissed.

- The Office worked with the Respondent and FFEHI to complete the approval of the acquisition application. The Office approved the proposed acquisition on March 25, 2009 via Order #103392-09.

- On May 20, 2009, the acquisition of the Respondent by FFEHI occurred.

(Loree Cert., Ex. A at 003-04)

On May 22, 2009, based on the closing having divested Mr. Kernan of any interest in ICA, the Circuit Court dismissed the Order to Show Cause. (Loree Cert. Ex. A at 001)

### J. Kernan and IPA Bring Actions Against ICA in the Supreme Court, Oneida County and in the Northern District of New York

Despite the Florida Insurance Regulators' Orders, and the terminated receivership proceedings, Kernan, IPA, Oriska Insurance Company and Oriska Corp.have brought several lawsuits against ICA, First Florida, and Gary T. Hirst. (Mr. Hirst serves as ICA's Chairman, Director and Chief Investment Officer, and has a 47 .5% beneficial ownership interest in the company.)

These actions are: *Oriska Insurance Company v. Insurance Company of the Americas*, Index No. CA2011-001188 (Sup. Ct., Oneida County); *Oriska Corporation, et al. v. Insurance Company of the Americas*, Index No. CA 2009-001682 (Sup. Ct., Oneida County); and *IPA Acquisitions, Inc. v. Insurance Company of the Americas, et al.*, 12-cv-0499 (N.D.N.Y.) (the "Northern District" action). (See Certification of David Ata, executed on August 16, 2016 ("Ata Cert."), at ¶¶ 2-3.)

The Northern District Action was commenced in December 2013 by IPA and attempted to allege various vague claims of misconduct against ICA and others, the gist of which appeared to be a claim that IPA succeeded to the rights and obligations of Employee Leasing Solutions, Inc. ("ELS"), an ICA insured, with rexpect to certain New York Department of Financial Services Regulation 114 Trusts that ICA had funded as grantor. *See, generally*, 11 NYCRR § 126.1 et seq. (a/k/a "Regulation 114").

Signficantly for purposes of IPA's current intervention gambit-- which seeks a forum in which to establish a belated and time-barred claim that, contrary to the Florida Regulators' Order and those of the Florida Circuit Court, Leon County, IPA is

10

somehow the true owner of ICA—IPA did not claim (in the alternative or otherwise) in the Northern District Court that IPA was entitled to the trust funds because they allegedly succeeded to the rights of *ICA*. It would have made that claim in the Northern District Action had it believed it to have any merit back in 2013, and it certainly could have made such a claim in that action.

In the Northern District Action, IPA filed two Amended Complaints, the first of which was dismissed with leave to replead, and the second of which was dismissed with prejudice because the Court determined that leave to replead would be futile. *See IPA Acquisitions, Inc. v. Insurance Compnay of the Americas*, No. 6:12-CV-499 (NAM/DEP), slip op. at 1-7, 10-20 (N.D.N.Y. Sept. 24, 2014) (copy annexed as Ex.C to the Loree Cert.)

Like IPA's application to intervene, IPA's allegations against ICA (and the other defendants in the Northern District Action are riddled with generalized, conclusory and hyperbolic allegations of purported misconduct by defendants and asserted, as if a given, rights IPA simply does not possess (i.e.,successor rights with respect to ELS, an ICA insured and trust beneficiary) and legal duties not owed to it by defendants. The Court dismissed the action without leave to replead principally because IPA failed twice to plead facts establishing the duties it claimed and to provide particularized allegations of fraud where required by Fed. R. Civ. P. 9(b). Slip op. at 11-14, 15-19.

While Kernan appealed Senior U.S. District Judge Norman Mordue's well-reasoned order and judgment to the U.S. Court of Appeals for the Second Circuit, the appeal was dismissed by stipulation pursuant to Second Circuit Local Rule 42-1. (See Ata Cert., ¶¶ 6-10; Loree Cert., Ex. D) dAs of August 16, 2016, the stipulation the parties entered into permitted reinstatement of the appeal (we understand that the

11

last day for IPA to reinstate its appeal falls in September 2016). (See Ata Cert., ¶ 8.)
*See, generally*, Second Circuit Local R. 42.1.

### K. Kernan Sues New York's Insurance Regulatory Authorities and Loses

Kernan's litigation relating to the self-inflicted harm his violations of state and
federal insurance-related laws has not been confined to the litigation he has brought
(or as respects IPA's application to intervene, seeks to bring) against ICA, Mr. Hirst
and others. As of the date of this brief he has unsuccessfully attempted to bring two
actions against state and federal governments and/or their officials or agencies.

In *Kernan v. The State of New York*, Mr. Kernan filed a claim "seeking
compensation for injuries allegedly caused to [his] professional reputation and
standing in the professional/business community due to the alleged misfeasance of
New York State's Department of Insurance and its Department of Financial Services."
*Kernan v. The State of New York*, No. 2016038534, Claim No. 126419, slip op. at 1
(N.Y. Ct. May 27, 2016) (copy annexed as Ex. E to the Loree Cert.) Kernan alleged that
the New York insurance regulators "investigated and harassed" him "and Oriska
Insurance Company (OIC) without justifiable purpose , engaged in various abuses of
process relating to the records and business of OIC and participated with federal
prosecutors in the prosecution of claimant and his wife, and withheld evidence that
would have exonerated claimant on federal criminal charges to which he eventually
pled guilty." All this, said Kernan's Notice of Claim, was "'wholly uncalled for and
violated [his] fundamental rights and resulted in claimant's wrongful conviction of
violating 18 USC Section 1033 (e) (1) (B) resulting in damage to Claimant.'" Slip op. at
1-2 (quoting Notice of Claim).

Kernan alleged that his claim accrued on:

'July 11, 2014, when for the first time Claimant learned through a Declaration of a Senior Investigator for the California Department of Insurance that for over a decade the State of New York through its Department of Insurance and later through its Department of Financial Services and without justifiable cause or basis had instituted, encouraged and pursued a continuous course of conduct designed to prohibit Claimant from in any way engaging in the business of insurance which led to the indictment and ultimately to a plea during which time the State of New York possessed conclusive evidence of the innocence of Claimant and that there was no wrongdoing by either Oriska Insurance Company or Claimant or any of their agents or employees.'

Slip op. at 2 (quoting Notice of Claim).

Kernan then proceeded to list eight acts, or categories of acts, of wrongful conduct allegedly perpetrated by New York's Insurance Regulators against him, some of them were characterized as part of a concerted effort on the part of New York State governmental officials to "with[o]ld and suppress[]" "'exonerating evidence possessed by the State of New York when all the time the State of New York knew they were both not guilty." Slip op. at 2 (quoting Notice of Claim). No such "exonerating evidence" was identified by Kernan, and he did not explain who allegedly suppressed it, how it was suppressed and when, exactly, the suppression purportedly occurred.

On May 27, 2016, the Court of Claims dismissed Kernan's law suit against the State of New York, finding that his notice of claim lacked the requisite particularity required by New York statute to assert claims against the State, and that, in any event, the notice of claim failed to demonstrate that his claims arose no later than 90-days before he filed the notice of claim, and therefore were timely asserted:

In the view of the Court, these allegations are insufficient to describe the nature of the claim. The assertions that for 'over a decade the State of New York through its Department of Insurance and later through its Department of Financial Services' are not supported by any factual allegation of the period of time encompassed by the 'over a decade' that is referred to, nor by facts that would allow defendant to determine which of the offices of its departments were involved, nor the name of any employee of defendant who was involved in the misfeasance that is alleged, nor the particular wrongful conduct in which any employee

13

allegedly engaged. The allegation that defendant acted "without justifiable cause or basis" is a patently conclusory legal assertion, supported only by claimant's self-serving assertions of innocence.

. . . .

[Kernan's claim. . . provides the reader with only a generalized scenario in which, at unspecified times over the course of a decade, unnamed divisions or individuals within two of defendant's executive

departments investigated and took several generalized actions against claimant and/or OIA, and participated with the FBI and federal prosecutors in an unspecified manner with respect to an investigation and prosecution of claimant related to his professional activities that ultimately concluded with a guilty plea, and that defendant failed to produce unspecified information that allegedly would have exonerated claimant. The claim is devoid of any particularization of any actions that were taken by whom and were committed when and where. The assertions in the claim that "all of the foregoing actions by the State of New York were wholly uncalled for and violated Claimant's fundamental rights and resulted in claimant's wrongful conviction of violating 18 USC Section (e)(1)(B)' do not clarify the nature of the claim or the basis upon which claimant seeks to hold defendant liable. In sum, the pleading does not set forth the nature of the claim with sufficient particularity and thus, defendant's motion to dismiss the claim. . . for lack of compliance with Court of Claims Act § 11(b) will be granted.

Even if the claim met the pleading requirements of Court of Claims Act § 11 (b), it would be further jurisdictionally defective as untimely. . . .

The claim alleges an accrual date of July 11, 2014 'when for the first time Claimant learned through a Declaration of a Senior Investigator for the California Department of Insurance that for over a decade [defendant] . . . without justifiable cause or basis had instituted, encouraged and pursued a continuous course of conduct. . . which led to the indictment and ultimately to a plea.' Accordingly, the last date of malfeasance alleged in the claim and thus, the accrual of the claim, occurred no later than the date of claimant's plea, which was March 20, 2009 (see Shoemaker Affirmation, Exhibit C). Ninety days thereafter was June 18, 2009, and the Notice of Intention to file a claim that was served upon the Attorney General on October 14, 2014 as well as the claim that was filed and served on July 10, 2015 were untimely by more than five years.

Slip op. at 3-4 (citations and footnote omitted).

**L. Kernan Brings a Federal Class Action Law Suit against the U.S. Government and Various New York, Florida and Illinois Officials and Agencies, including the Florida Regulatory Authorities**

Kernan's March 20, 2009 guilty plea arose out of a fifteen count superseding

indictment that alleged he was involved in a scheme to defraud several professional

employer organizations by misrepresenting that Oriska Insurance Company ("Oriska") was authorized to write workers compensation insurance. *See Kernan v. New York State Dep't of Financial Services*, No. 13-CV-3196 (JS)(ARL), slip op. at 4 (E.D.N.Y. July 15, 2015) (copy attached as Ex. F to the Loree Cert.) Kernan's guilty plea admitted a violation of 18 U.S.C. § 1033(e)(1)(B), which prohibits persons engaged in the insurance business from willfully permitting certain convicts to engage in the insurance business. Slip op. at 4. And, by the express terms of the statute, and Mr. Kernan's Plea agreement, Mr. Kernan was (and still is) barred from engaging in the business of insurance. *See* Slip op. at 4 (citing 18 U.S.C. § 1033(e)(1)(A) (which prohibits "[a]ny individual . . . who has been convicted of an offense under this section" from willfully engaging in the insurance business).

This statutory bar, which resulted from Mr. Kernan's guilty plea, prompted Mr. Kernan to file in the U.S. District Court for the Eastern District of New York, a class action suit against the New York Department Financial Services (the "Department"); several current and former Department officials; the United States of America (as its interests appear); several persons "individually, and collectively, alone and in concert with present and former associates and other still unidentified parties[,]" including Florida Insurance Regulator Robin Wescott, who submitted two affidavits in the ICA receivership proceedings discussed above; Andrew Boron, Director of the Illinois Department of Insurance; Patrick Hughes, Deputy Director of the Illinois Office of the Special Deputy, Illinois Department of Insurance; Illinois Office of the Special Deputy; and the Florida Office of Insurance Regulation. *See* slip op. at caption & 4.

Mr. Kernan purported to sue "individually and on behalf of all those independent entrepreneurs, small and disadvantaged business enterprises, suffering serious, permanent and irreparable economic and social injury and damage as a result

15

of actions by the Defendants to limit the effectiveness of Plaintiffs James M. Kernan, Oriska Corporation and Oriska Insurance Company to support the efforts of independent entrepreneurs, small and disadvantaged business enterprises to create jobs for the disadvantaged which can lead to rewarding careers providing reliable and steady income and benefits for their workers and their families. . . ." Slip op. at caption. Oriska Corporation and Oriska Insurance Company were also made parties. *Id.*

Mr. Kernan's Complaint against the New York Department of Financial Services was apparently based on the Department's having refused to overturn the practice bar imposed on violators of 18 U.S.C. § 1033(e)(1)(B). *See* slip op. at 5. Section 1033(e)(2) authorizes a barred person to apply to an authorized regulatory official to relieve the convicted person from the bar. Slip op. at 5. Kernan applied to the Department for such relief, but the Department denied his application in February 2013. *Id.* The Department also determined that Mr. Kernan had, pursuant to N.Y. Ins. Law § 1506(c), demonstrated that he was "untrustworthy" in his capacity as a control person for Oriska. Accordingly, the Department ordered Mr. Kenan to divest himself of his Oriska holdings. *See* slip op. at 5. Kernan unsuccessfully attempted to challenge those determinations in an Article 78 Proceeding. *Id.*

Other states, including Florida and Illinois likewise "took affirmative steps to ensure that Kernan could not practice in the business of insurance." Slip op. at 6. According to Kernan's complaint, Florida and Illinois placed at least some of Kernan's insurance interests into receivership. Slip op. at 6.

While not all of the defendants appeared, the ones who chose that course promptly moved to dismiss the complaint. The Court granted their motions, and

16

dismissed the complaint sua sponte as against the non-appearing defendants. Slip op. at 2-3.

The Complaint attempted to allege various federal and constitutional causes of action, including an alleged Section 1983 perpetrated by the insurance regulators of various states, the "suppression" of evidence exonerating him from guilt that he would later reassert in the Court of Claims, as well as a claim for Article 78 relief. The Court dismissed with prejudice all of the Oriska Corp.'s claims on standing grounds because any injury it may have suffered was merely derivative of its ownership of Oriska, and thus not personal in nature. Slip op. at 8-9. The Court also dismissed Kernan's and Oriska Insurance Company's Title VII and Section 1983 discrimination claims on standing grounds.. *See* Slip op. at -11.

The Court dismissed Kernan's and Oriska Insurance Company's remaining claims on various grounds, which are summarized in the Court's opinion at 13-20. For example, Kernan's and Oriska Insurance Company's Section 1983 conspiracy claim was dismissed principally because its conclusory allegations failed to establish a plausible basis for inferring the existence of an agreement among the alleged conspirators. *See* slip op. at 13-15. And Kernan's suppression of exculpatory evidence claim – which the Court construed to be a malicious prosecution claim – failed because Plaintiff did not (and could not) claim that any proceeding had terminated in his favor, an essential element of such a claim. *See* slip op. at 15 (citation omitted).

### M. IPA Moves to Intervene in this Federal Arbitration Act Proceeding

On July 22, 2016 IPA, an entity owned and controlled by Kernan, applied to this Court for an Order permitting it to intervene as a matter of right under Fed. Civ. P. 24(a)(2). (ICA I Dk. 56) This time around, IPA alleges not to be the successor of one

17

of ICA's insureds, but of ICA itself, which the Florida Insurance Regulators have declared to be owned and controlled by First Florida.

IPA wants this Court to overturn the more than seven-year-old determination of the State of Florida approving First Florida's purchase of ICA, a claim that IPA has never challenged in Florida and had the opportunity to challenge several times in other litigation Kernan and IPA have brought, including the Northern District Action. For the reasons set forth below, and argued at the Court's August 3, 2016 conference, IPA's motion should be summarily denied.

**ARGUMENT**

**POINT I**

**THE MOTION TO INTERVENE IS UNTIMELY**

Fed. R. Civ. P. 24(a)(2) sets forth a four-part test for whether a person or entity can intervene as a matter of right: :

> Upon [1] timely application anyone shall be permitted to intervene in an action ... when the applicant [2] claims an interest relating to the property or transaction which is the subject of the action and [3] the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless [4] the applicant's interest is adequately represented by existing parties. [Bracketed numbers added for clarity by L&L]

Fed.R.Civ.P. 24(a)(2).

Failure to satisfy any of these four requirements will justify the denial of a motion to intervene. *Floyd v. City of N.Y.*, 770 F.3d 1051, 1057 (2d Cir. 2014); *Washington Elec. Co-op., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 922 F.2d 92, 96 (2d Cir. 1990).

Key factors pertinent to whether a motion to intervene is timely are: (a) the length of time the applicant knew or should have known of its interest before making

18

the motion; (b) prejudice to existing parties resulting from the applicant's delay; (c) prejudice to the applicant if the motion is denied; and (d) the presence of unusual circumstances militating for or against a finding of timeliness." *Floyd*, 770 F.3d at 1058; *accord MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 390 (2d Cir. 2006).

IPA has not and cannot establish that its application is timely. By attempting to intervene in this proceeding IPA is claiming that this Court should overturn the Florida Insurance Regulators' March 25, 2009 determination approving ICA's agreement with IPA to purchase 100% of ICA's common stock. There is no legitimate dispute on that score, because that is exactly what IPA's Petition says:

> Florida Statute §628.461(8) provides that 'There shall be a private right of action favor of the domestic stock insurer or controlling company to enforce the provisions of this section.' Therefore, IPA as the controlling company is enforcing the provisions of the Statute that the transfer was void as a matter of statutory law and that IPA, not Hirst, is the real party in interest in this proceeding to protect the award against Lloyds.

(See IPA's Petition to Intervene, ¶ 30, ICA I Dk. 56-3 at 12 of 18.)

By Florida statute, ICA had 4 years to enforce the claim, yet it never attempted to do so, choosing instead to litigate with ICA and others on numerous other fronts. *See* Fla. Stat. § 95.11(3)(f) & 3(p); *see Jones v. Sun Bank/Miami, N.A.*, 609 So.2d 98, 03 (Fla. App. 3rd Dist.). Even if New York Law were to govern timeliness, the such a private right of action would be barred after three years, CPLR 214(2), or at most, six years. CPLR 213(1) (action for which no limitation is specifically prescribed by law).

Accordingly, as a matter of law, IPA's putative claim is untimely. But even if there were no statute of limitations, or even if the statute of limitations had not expired, the motion would still be untimely.

There is nothing in the record indicating that IPA should not have known of the facts and circumstances that form the basis of the claim that they now ask the Court to resolve. They have been on notice since the claim accrued back in March of 2009, or, at the latest, May 2009. They have, as previously detailed, asserted a number of litigations relating to IPA's alleged interests with respect to ICA, yet they have never asserted any such claim, despite having the opportunity to do so. Instead, in the Northern District, IPA took the position that it succeeded to the rights of one of ICA's insureds, not those of IPA itself.

Mr. Kernan also testified at the Arbitration, and thus had an opportunity to object to the arbitration on the ground that he or IPA believed they were entitled to the proceeds of the arbitration award because somehow the transaction approved by the Florida Insurance Regulators so many years ago was somehow void, then that is something that Kernan should have advised the parties and the arbitrators about. But neither he nor ICA did so. Rather, when Mr. Stalker asked what financial interest Mr. Kernan had in the outcome of the arbitration, Mr. Kernan replied: "I don't know that I have a financial interest. It was a matter that had to do with contracts that I signed I have an interest in that, things that I agreed to." (See Hearing Tr. at 208-09, ICA II Dk. 17-4, at 53-54 of 266.)

IPA's attempt to explain why they waited more than seven years to make their claim is unavailing. IPA claims that despite having hired a private detective, it was unaware of the existence of these arbitration enforcement proceedings, which are now fully briefed and which were commenced at the beginning of this year. Once IPA and Kernan knew about the arbitration they had to know that arbitration enforcement proceedings were quite likely. A simple weekly or even monthly check of PACER using

"Insurance Company of the Americas" as a search term would have quickly alerted them to the existence of these proceedings.

But IPA did not do that, and even if they had done it, by the time these proceedings began, their claim would still have been untimely and not have warranted intervention.

IPA's other excuses are no better. For example, making assertions about who said what to whom in settlement negotiations arising out of the Northern District action, IPA contends that Mr. Hirst made some "commitment" to IPA concerning settlement of the Northern District Action, but those contentions are inaccurate. ICA's counsel, Mr. Ata, has submitted a certification confirming, among other things, that he recalls no such "commitments" being made. (See Ata Cert. ¶¶ 9-10.)

IPA's arguments are not only inaccurate but irrelevant. First, the possibility of settling the Northern District Action has no bearing on the dispute between ICA and its London reinsurers concerning the Award. Second, the earliest communication about alleged confirmations about the withdrawal of the Northern District Action appeal was, according to Mr. Burns, on May 21, 2015 – more than six-years after the Florida Insurance Regulators approved the transaction and about six years from the date the transaction closed. (See Ata Cert., at 9.)  Third, as a matter of law, the existence of settlement negotiations before or after the expiration of a statute of limitations does not toll the statute of limitations in the absence of express waiver or detrimental reliance, and in any event, once the statute of limitations has expired, a plaintiff cannot detrimentally rely on settlement negotiations extending the limitations period. *Gilbert Frank Corp. v. Federal Ins. Co.*, 70 N.Y.2d 966, 525 N.Y.S.2d 793, 520 N.E.2d 512 (N.Y., 1988).

21

The remaining factors pertinent to timeliness also weigh heavily in favor of ICA and against IPA. First, ICA would be prejudiced by further delay because this case is a summary proceeding under the Federal Arbitration Act. Arbitration cannot work if confirmation proceedings are transformed into plenary proceedings. *See Orion Shipping and Trading Corp. v. Eastern States Petroleum Corp.*, 312 F.2d 299, 301 (2d Cir. 1963). As the U.S. Supreme Court has stated:

> Instead of fighting the text, it makes more sense to see the three provisions, [FAA] §§ 9–11, as substantiating a national policy favoring arbitration with just the limited review needed to maintain arbitration's essential virtue of resolving disputes straightaway. Any other reading opens the door to the full-bore legal and evidentiary appeals that can "rende[r] informal arbitration merely a prelude to a more cumbersome and time-consuming judicial review process," Kyocera, 341 F.3d, at 998; cf. Ethyl Corp. v. United Steelworkers of America, 768 F.2d 180, 184 (C.A.7 1985), and bring arbitration theory to grief in post-arbitration process.

*Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 588 (2008).

The delay that intervention would cause would be very substantial and the cost imposed on ICA very high. That cost cannot be justified to allow IPA to assert yet another fanciful—indeed, time-barred—claim.

By contrast, IPA would not be prejudiced by a denial of intervention. It has had numerous opportunities to challenge the Florida Regulator's approval of the SPA. That is too late for it to do so now is its own fault.

Finally, this case does not involve any special circumstances that would justify Intervention.

## POINT II

## THE COURT SHOULD DENY INTERVENTION BECAUSE IPA LACKS THE REQUISITE SUBSTANTIAL, DIRECT AND LEGALLY COGNIZABLE INTEREST IN THE SUBJECT MATTER

Under Fed. R. Civ. P. 24(a)(2) the putative intervenor must "claim an interest relating to the property or transaction which is the subject of the action. . . . " The interest claimed must be direct, substantial and legally cognizable, and cannot be remote or contingent. *See, e.g., Washington Elec. Co-op., Inc. v. Massachusetts Mun. Wholesale Elec. Co.*, 922 F.2d 92, 97 (2d Cir. 1990). Put differently, the interest must be such that it makes the putative intervenor a "necessary party" under Fed. R. Civ. P. 19(a). *See Mastercard*, 471 F.3d at 389.

IPA's argument that it should be allowed belatedly to challenge the Florida Insurance Regulators' order approving the SPA does not meet the interest in the subject matter requirement of the statute. First, that interest is contingent and remote, not direct and substantial. Like the unsuccessful putative intervenor in *Washington Electric*, there are multiple contingencies that must occur before ICA could have anything approaching a direct and substantial interest in the subject matter— here the arbitration award. IPA would have to; (a) establish valid grounds for challenging the order under the Florida statute; (b) overcome some very powerful affirmative defenses, including the statute of limitations, and (c) the Florida and New York Insurance Regulators would have to be willing to allow a company owned by Kernan (IPA) to own and control ICA despite the prior receivership proceedings in Florida and the New York Department of Financial Services' more recent order that Mr. Kernan divest himself of his Oriska Insurance Company holdings because of his "untrustworthiness."

23

Second, IPA cannot establish that it is necessary party to these confirmation proceedings. It is not a party to the reinsurance agreements or their arbitration clauses, it did not attempt to intervene in the arbitration proceedings and it is not a party to the arbitration award.

It thus lacks the direct, substantial and legally cognizable interest that Fed. R. Civ. P. 24(a)(2) requires.

IPA's brief punts on the issue of the interest required to support intervention and simply refers back to its July 22, 2016 Petition to Intervene.

The remaining requirements for Fed. R. Civ. P. 24(a)(2) intervention are also not satisfied here. Even if IPA had a cognizable interest in the subject matter its ability to protect that interest would not be impaired by denying intervention because it is already impaired by ICA's failure to assert its alleged rights in a timely fashion.

And in any event, if ICA somehow does have an interest in the subject matter, ICA is protecting it because it is seeking confirmation of the award. IPA's contention that Mr. Hirst's legal troubles somehow should make the court assume that ICA will somehow not use the proceeds of the Award to protect its insureds is not only baseless, but blind to reality. ICA is an insurance company that is highly regulated by the Florida Insurance Regulators. It is they that are charged with protecting the policyholders, not IPA and Mr. Kernan, a man who cannot lawfully engage in the business of insurance in any event.

**CONCLUSION**

For all of the foregoing reasons, ICA respectfully requests that the Court deny IPA' motion to intervene.

24

Dated:   New York, New York
          August 17, 2016

                              LOREE & LOREE

                By:  _____

                              Philip J. Loree Jr. (PL-2213)
                              830 Third Avenue
                              Fifth Floor
                              New York, New York 10022
                              (646) 253-0560
                              (516) 627-1720 (alt.)
                              (516) 941-6094 (mobile)
                              Fax: +1 (800) 627-3118
                              PJL1@LoreeLawFirm.com

                              ATTORNEYS FOR
                              RESPONDENT INSURANCE
                              COMPANY OF THE AMERICAS

To all counsel in these consolidated
proceedings (via ECF):

Leighton R. Burns, Esq.
Kernan & Kernan, P.C.
185 Genesee Street, Suite 1401
Utica, New York 13501-2194
Telephone: (315) 797-8300
LBurns@kernanlaw.com

*Attorneys for Putative Intervenor*
*IPA Acquisitions, Inc.*

Timothy Wayne Stalker, Esq.
Weber Gallagher Simpson Stapleton Fires & Newby LLP
2000 Market Street, 13th Floor
Philadelphia, PA 19103
215-972-7922
Fax: 215-564-7699
Email: tstalker@wglaw.com
*ADMITTED PRO HAC VICE*

Ryan Ashley Nolan, Esq.
Weber Gallagher Simpson Stapleton Fires & Newby LLP
2000 Market Street; 13th Floor
Philadelphia, PA 19103

(215)-972-4989
Email: rnolan@wglaw.com

Kenneth M. Portner, Esq.
Weber Gallagher Simpson Stapleton Fires & Newby LLP
2000 Market Street, 13th Floor
Philadelphia, PA 19103
(215) 972-7921
Fax: (215) 564-7699
Email: kportner@wglaw.com

*Attorneys for Certain Underwriting Members of Lloyds of London
in Case No.* 1:16-cv-00323-VSB

Joseph Nicholas Froehlich, Esq.
Locke Lord LLP
200 Vesey Street
New York, NY 10281
(212) 415-8600
Email: jfroehlich@lockelord.com

Joshua P Broudy, Esq.
Locke Lord LLP
20 Church Street, 20th Floor
Hartford, CT 06103
(860)-541-7750
(888)-325-9741 (fax)
Email: josh.broudy@lockelord.com
*ADMITTED PRO HAC VICE*

*Attorneys for Petitioner in Case No.* 1:16-cv-00374-VSB,
*Certain Underwriting Members of Lloyds, London
Subscribing to Treaty No. 0272/04*