```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: ___3/31/2017___
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
                                                     :
CERTAIN UNDERWRITING MEMBERS                         :
AT LLOYD'S OF LONDON,                                :
                                                     :
                            Petitioner,              :          16-CV-323 (VSB)
              -v-                                    :
                                                     :
INSURANCE COMPANY OF THE                             :
AMERICAS,                                            :
                                                     :
                            Respondent.              :
                                                     :
------------------------------------------------------X
                                                     :
CERTAIN UNDERWRITING MEMBERS AT                      :
LLOYD'S, LONDON SUBSCRIBING TO                       :
TREATY NO. 0272/04,                                  :
                                                     :
                            Petitioner,              :          16-CV-374 (VSB)
                                                     :
              -v-                                    :          **MEMORANDUM & ORDER**
                                                     :
INSURANCE COMPANY OF THE                             :
AMERICAS,                                            :
                                                     :
                            Respondent.              :
                                                     :
------------------------------------------------------X

Appearances:

Kenneth M. Portner
Timothy W. Stalker
Weber Gallagher Simpson Stapleton Fires & Newby, LLP
Philadelphia, Pennsylvania
*Counsel for Petitioner Certain Underwriting Members at Lloyd's of London*

Joseph N. Froehlich
Locke Lord LLP
New York, New York
*Counsel for Petitioner Certain Underwriting Members of Lloyds, London Subscribing to Treaty
No. 0272/04*

1

Phillip J. Loree, Jr.
Loree & Loree
New York, New York
*Counsel for Respondent Insurance Company of the Americas*

VERNON S. BRODERICK, United States District Judge:

Currently pending before me are (1) the motion of Petitioner Certain Underwriting Members at Lloyd's of London ("Underwriters I") to vacate the arbitration award, (16-cv-323, Doc. 7),[1] (2) the motion of Petitioner Certain Underwriting Members of Lloyds, London Subscribing to Treaty No. 0272/04 ("Underwriters II") to vacate or modify the arbitration award, (16-cv-374, Doc. 5), (3) the cross-motions of Respondent Insurance Company of the Americas ("ICA") to confirm the arbitration award, (16-cv-323, Doc. 21; 16-cv-374, Doc. 21), and (5) the joint motion of the parties for oral argument on the pending motions, (Doc. 46).

Because I do not believe oral argument would be beneficial to my rendering a decision on the pending motions, the joint motion of the parties for oral argument, (Doc. 46), is DENIED. Further, because I find that the undisclosed relationships of the party arbitrator for ICA are significant enough to demonstrate evident partiality, Underwriters I's motion to vacate the arbitration award, (16-cv-323, Docs. 6), is GRANTED, and ICA's cross-motion to confirm the arbitration award against Underwriters I, (16-cv-323, Doc. 21), is DENIED. Because Underwriters II joined in the arguments of Underwriters I for vacatur, Underwriters II's motion to vacate the arbitration award, (16-cv-374, Doc. 5), is GRANTED, and ICA's cross-motion to confirm the arbitration award against Underwriters II, (16-cv-374, Doc. 21), is DENIED. To the

---

[1] I consolidated 16-cv-323 and 16-cv-374 on February 25, 2016 upon agreement of the parties that the matters warranted consolidation, and directed that all future filings in the consolidated matter use the number of the first-filed case, 16-cv-323. (16-cv-323, Doc. 19.) Accordingly, my references to the docket for documents filed prior to February 25, 2016 indicate to which docket they refer, i.e. "16-cv-323, Doc. X." For all documents filed subsequent to February 25, 2016, I use simply "Doc. X," which refers to the docket in 16-cv-323.

extent Underwriters II sought to modify the arbitration award, its motion, (16-cv-374, Doc. 5), is DENIED as moot.

## I.   **Background**

The basic facts underlying the arbitration here do not appear to be in dispute.  ICA is an insurance company licensed in the state of Florida which is primarily involved in providing workers' compensation insurance for professional employment organizations.  (2/19 Hirst Cert. ¶ 2.) [2]  Beginning in December 31, 2004, ICA purchased from certain Lloyd's underwriters two reinsurance treaties—Treaty 0274/04 and Treaty 0272/04 (the "Treaties")—collectively containing three layers of reinsurance coverage providing excess-of-loss reinsurance for ICA's workers compensation policies.  (16-cv-374, Vacate Pet. ¶ 19; 2/19 Hirst Cert. ¶¶ 6-10.)  Treaty 0274/04 reinsured losses falling within the first and second layers of coverage:  Part A reinsured the first Layer and Part B reinsured the second Layer.  (2/19 Hirst Cert. ¶ 7.)  Part A of this Treaty provided reinsurance in the amount $1.5 million per occurrence in excess of $1 million per occurrence ("First Layer"), while Part B of this Treaty provided reinsurance in the amount of $2.5 million per occurrence in excess of $2.5 million per occurrence ("Second Layer").  (*Id.* ¶ 8.) Treaty 0272/04 reinsured losses falling within the Third Layer, and provided reinsurance in a maximum amount of $5 million per occurrence in excess of $5 million per occurrence.  (*Id.* ¶¶ 9-10.)

The dispute giving rise to this arbitration involved two workers' compensation claims, each of which arose under a workers' compensation policy issued by ICA and reinsured by the Treaties.  (*Id.* ¶ 11.)  One of the claims was brought by Alan Kringel, who suffered significant

---

[2] "16-cv-374 Vacate Pet." refers to the Petition to Vacate or Modify Arbitration Award.  (16-cv-374, Doc. 1.)  "2/19 Hirst Cert." refers to the February 19, 2016 Certification of Gary T. Hirst.  (16-cv-374, Doc. 17.)

injuries from a diving accident in 2005 at age 16 for which he now requires around the clock

care, seven days a week, and he will require such care for the rest of his life.  (*Id.* ¶ 12.)  ICA

states that it had paid approximately $4 million for Kringel's care as of the date of the arbitration,

and that it estimates it will have to pay $7.5 million more.  (*Id*. ¶ 14.)  The second claim was

brought by Leon Arnold.  (*Id.* ¶ 15.)  Arnold was severely injured in 2005 when a stack of

drywall collapsed on him.  ICA has paid $1,007,842.57 for Arnold's treatment.  Unlike

Kringel's, Arnold's claim is now closed and should not require significant additional payments.

(*Id.*)

In March 2011, ICA informed Underwriters I, but not Underwriters II, of these claims.

(Underwriters II Br. at 4; 2/19 Hirst Cert. Ex. N, at 41.)[3]  ICA did not actively pursue

reimbursement for these claims until November 2013, again only from Underwriters I.  (2/19

Hirst Cert. Ex. N, at 41-42.)  Underwriters I declined coverage in January 2014.  (*Id.*)  By letter

dated December 23, 2014, ICA demanded arbitration against Underwriters I and Underwriters II.

(*Id.* at 44.)  Pursuant to Article 24 of Treaty 0274/04, ICA also appointed Alex Campos

("Campos" or "Arbitrator Campos") as its designated arbitrator in this letter, and requested that

Underwriters I designate its appointed arbitrator within thirty days.  (*Id.*)  This letter was sent by

Federal Express to Clive Harris of Atrium Underwriters Ltd., Ted Davey of Alternative

Reinsurance Products, and Gresham Insurance Brokers Ltd.  (*Id.*)  Underwriters I subsequently

designated Trevor Clegg as its arbitrator ("Clegg" or "Arbitrator Clegg") and, when the parties

could not agree on an umpire, Ben Hernandez ("Hernandez" or "Umpire Hernandez") was

selected.  (*See* Underwriters I Br. at 13; ICA Br. at 7.)[4]

---

[3] "Underwriters II Br." refers to the April 1, 2016 Memorandum of Law of Petitioners Certain Underwriting Members at Lloyd's, London Subscribing to Treaty No. 0272/04 in Opposition to Respondent's Cross-Motion to Confirm the Arbitration Award.  (Doc. 44.)

[4] "Underwriters I Br." refers to the Petitioner's Motion to Vacate Arbitration Award Pursuant filed on January 21,

Circumstances surrounding the initiation of the arbitration and their significance are, at least in part, in dispute here.  First is the issue of notice of the arbitration demand to Underwriters II.  As stated above, ICA never provided notice of the claims to Underwriters II prior to the notice of arbitration, and the December 23, 2014 notice of arbitration—which ICA contends requested arbitration from both Underwriters I and Underwriters II[5]—was sent to Clive Harris, Ted Davey, and Gresham Insurance Brokers Ltd. ("Gresham").  (2/19 Hirst Cert. Ex. N, at 44.)  Atrium is the lead underwriter for Treaty 0274/04, and Davey is purportedly "the individual contact at Gresham who had negotiated the treaties," whom ICA served "at his then-current employer's address."  (2/19 Hirst Cert. Ex. N, at 3.)  Pursuant to the terms of Treaty 0272/04, Gresham was listed as the "Intermediary negotiating this Agreement for all business hereunder," meaning that "[a]ll communications (including but not limited to notices . . .) relating [to Treaty 0272/04] shall be transmitted to the Reinsured or the Reinsurers through Gresham."  (2/19 Hirst Cert. Ex. B, at 22.)  However, by the time the notice of arbitration was sent, Gresham was defunct.  (2/19 Hirst Cert. Ex. N, at 3.)

Certain provisions of the Treaties and their interpretation were disputed during the arbitration.  For example, a principal area of disagreement and argument during the arbitration concerned Article 1 of Treaty 0274/04 and related passages (Treaty 0272/04 contains the same passages).  In Treaty 0274/04, Article 1, Section A reads "This Agreement is only to pay the

---

2016.  (16-cv-323, Doc. 7.)  "ICA Br." refers to the February 26, 2016 Insurance Company of the America's Memorandum of Law in Opposition to Petitioner's Motion to Vacate Award in ICA I (Consolidated Case No. 16-cv-323 (VSB)).  (Doc. 20.)

[5] Underwriters II notes that, beyond the issue of whether it truly received the December 23, 2014 notice, the notice on its face is unclear that it involves a claim against Underwriters II.  The title of the letter is "Re: Demand for Arbitration Agreement Number 02724/04 and other Reinsurance Agreements," which specifically references only the Treaty involving the First and Second Layers of coverage.  (2/19 Hirst Cert. Ex. N, at 44.)  Further, the only mention of the Treaty involving Underwriters II in the text of the letter itself is in a parenthetical that appears after the demand for arbitration with the reinsurers for the First and Second Layers—"(as well as a third layer treaty contained in Agreement Number 0272/04, should the Claim rise to that level)."  (*Id.*)

excess of an Ultimate Net Loss to the Reinsured of USD 1,000,000 each loss occurrence with a limit of liability to the Reinsurers of USD 1,500,000 ultimate net loss each loss occurrence." (2/19 Hirst Cert. Ex. A, at 2.)  Similarly, Article 1, Section B reads "This Agreement is only to pay the excess of an Ultimate Net Loss to the Reinsured of USD 2,500,000 each loss occurrence with a limit of liability to the Reinsurers of USD 2,500,000 ultimate net loss each loss occurrence."  (*Id.*)  These provisions implicate or are related to a portion of Article 5, which states "It is warranted that:  1) No loss or losses are recoverable under this Agreement unless there are two or more lives, with a minimum each life value of USD 750,000.  2) The maximum claim any one person shall not exceed USD 2,500,000 (including costs) or so deemed."  (*Id.* at 3.)  Also relevant to these provisions is Article 7 which defines a "Loss Occurrence" as "any one disaster or casualty or accident or loss or series of disasters or casualties or accidents or losses arising out of or caused by one event."  (*Id.* at 4.)

Certain provisions of Treaty 0274/04 related to the arbitration process itself are also relevant to the arguments made by the parties.  Article 24 of Treaty 0274/04 provides that "One Arbiter shall be chosen by the Reinsured, the other by the Reinsurer, and an Umpire shall be chosen by the two Arbiters before they enter upon arbitration, all of whom shall be active or retired disinterested executive officers of insurance or reinsurance companies or Lloyd's London Underwriters."  (*Id.* at 13.)  This Article also provided that "If more than one Reinsurer is involved in the same dispute, all such Reinsurers shall constitute and act as one party for the purposes of this Article and communications shall be made by the Reinsured to each of the Reinsurers constituting one party."  (*Id.*)

On May 11, 2015, the arbitration panel—party arbitrators Campos and Clegg and Umpire Hernandez—held an organizational meeting.  (2/19 Hirst Cert. ¶ 18.)  The arbitration hearing

began on October 5, 2015, and lasted through October 8, 2015.  (*Id*.)  The parties have identified

certain events that occurred during the hearing and organizational meeting that they believe are

relevant to my consideration of the pending motions.  First, during the May 11, 2015

organizational meeting each member of the panel made affirmative disclosures regarding their

previous relationships with the parties and individuals involved in the arbitration.  Clegg went

first and stated:

> MR. CLEGG:  Okay.  I am not yet aware of the identity of the London underwriters but I suspect that one - or there is the potential that one of the underwriters involved in this would be a gentleman by the name of Andrew Winyard.  If Andrew is involved in this I have known him professionally for many years as an underwriter in the marketplace.  I do not have a personal relationship with him.  I have not actually seen him for an in excess of ten years but I have met him prior to that time at industry functions.  I believe Mr. Clive Harris of Atrium is the claims manager handling this matter for Lloyd's underwriters as the lead underwriter.  Similar to Mr. Winyard I have known Mr. Harris - I have met him from time to time at industry functions.  I don't have a personal relationship with him and I notice from the papers provided to the panel that the broker in this matter is Mr. Ted Davey.  I have -- I am aware of Ted Davey.  To the best of my recollection I have not transacted any business with him in the past but I know who he is and I know that he is a Lloyd's broker.  Those are my disclosures.
>
> MR. MAGLIERY:  I have a few questions.  Would you like to all make disclosures first or should I address you, Mr. Clegg?
>
> MR. CLEGG:  By all means.  Go ahead.
>
> MR. MAGLIERY:  Have you served as an umpire or arbitrator -- obviously we have the benefit of the Umpire's questionnaire but not the party arbitrators.  Have you served as an umpire or arbitrator for the Underwriters in this case or are you aware of the arbitrators in this case?
>
> MR. CLEGG:  I am aware that the lead underwriter is Atrium Syndicate.
>
> MR. MAGLIERY:  Have you served as umpire or appeared for Atrium before?
>
> MR. CLEGG:  Not to the best of my knowledge.  I will make the caveat that as I am sure you are aware in the London market it is common to have a subscription slip.  I can't say with 100 percent confidence that I have never been an arbitrator on a slip where Atrium had participated but I have never been appointed as an arbitrator where they have been the lead underwriter or where I was aware that they

were a participant.

MR. MAGLIERY:  Okay.  Obviously we are aware that this is a party arbitration but nevertheless all the arbitrators and the Umpire are required to be disinterested. I take it that you are disinterested in Atrium as that term is used in the ARIAS rules. You have no pecuniary interest or other relationship other than knowing Clive Harris?

MR. CLEGG:  No.

(5/11 Tr. 5:19-8:25).[6]  Umpire Hernandez went next.

THE UMPIRE:  Okay.  Up to an hour ago I could have by -- my summation would have been very short meaning I didn't know anybody here however I do know Mr. Gary Hirst.  Mr. Hirst and I worked together starting probably about three years ago.  I was asked to join a company that is licensed in Arizona that wanted to obtain a New Mexico insurance company license.  And so I assisted them with the form A and Mr. Hirst --

MR. HIRST:  I was counsel.

THE UMPIRE:  As counsel.  So he and I collaborated together on that form A.  It did not go anywhere other than exchanging the monies for my services rendered. There were no other monetary value.

MR. HIRST:  Which was not from me.

THE UMPIRE:  And it wasn't from him.  It was from the insurance company.  So we were both more consultant type people to this company.

MR. STALKER: What is the – can you give the identity of the insurance company?

THE UMPIRE:  The insurance company was going to be Santa Fe Insurance Company which again was not licensed at all.

MR. STALKER:  Was it going to be a company related to any of the companies that is the subject of this arbitration?

THE UMPIRE:  Not to my knowledge.

MR. STALKER: Were any of the principals either past or current of ICA or ORISKA or the reinsurance company, I think abbreviated as RCA, the three companies, were any of the principals involved in the licensing issue that you were

---

[6] "5/11 Tr." refers to the Transcript of the May 11, 2015 organizational meeting held in this arbitration.  A copy of the entirety of this transcript was provided to my chambers on a compact disc.

--

THE UMPIRE:  No.  None of the principals nor none of the companies named or listed in these documents were involved in that Santa Fe operation.  Again, to my knowledge.

MR. STALKER:  Can you describe what Mr. Hirst's role was in the licensing project?

THE UMPIRE:  His role was as general counsel so he provided the legal matters so in a form A as you know it is for the licensing and so you have a lot of legalese in there, you have a lot of financial information in there.  My role was to provide projections since it was a brand new company so I provided projections for that and he provided the legal part of that.  So if there was any overlapping it was where, you know, paragraphs had both wording and numbers attached.

(*Id*. 8:5-12:3.)  Finally, Campos provided his disclosure.

MR. CAMPOS: My name is Alex Campos.  I don't know anyone here except for Mr. Hirst.  I had some potential business dealings with him about ten years ago that never really materialized.  He had an associate that I was trying to do a deal with but it never went anywhere and other than that contact I don't have any other related contacts with Mr. Hirst.

MR. STALKER:  Did you have any business relationships with ICA?

MR. CAMPOS:  No.

MR. STALKER:  ORISKA or I will use the initials RCA?

MR. CAMPOS:  No.

MR. STALKER:  All right.  Did you do any work for any of the former principals of RCA or ORISKA?

MR. CAMPOS:  No.

MR. STALKER:  Can you just explain a little bit in detail what the - I will just call it the project you had with Mr. Hirst.

MR. CAMPOS:  There was going to be an investment by someone that I think Gary Hirst knew.  I don't remember the name of the person at the time but we, you know, looked at some due diligence and it just never materialized.  There was never -- I don't even think it got to contracts but it just never closed.

MR. STALKER:  That was about ten years ago?

MR. CAMPOS:  Roughly, yes.

MR. STALKER:  Nothing since then?

MR. CAMPOS:  Nothing since then.

(*Id*. 12:6-13:23).

Second, James Kernan—a former officer, director and principal of ICA—testified regarding certain communications he had about the Treaties' coverage with Ted Davey, the broker who placed the reinsurance treaty for ICA.  (Arb. Tr. 268-69.)[7]  At this point in the proceeding Underwriters I asked the arbitration panel to adjourn the arbitration to allow for the production of documents regarding these communications, but the panel refused because they believed ICA's responses in discovery gave Underwriters I ample notice of these documents and Underwriters I therefore could have subpoenaed the documents:

> THE UMPIRE:  Mr. Stalker, the panel has conferred and come to the consensus that we are going to deny your objection based upon the letter from Mr. Magliery dated August 5th, where he specifically, under general objections number 1, they objected to the discovery request to the extent it may seek information from companies other than ICA.  Therefore, we feel that they gave you ample time to respond in some manner to Mr. Magliery's letter and, if you didn't agree, you could have subpoenaed Mr. Kernan and/or his records and/or Oriska's records.  So, we feel that you had the time to do that.

> MR. STALKER:  I thank the panel for the consideration, and just for the record, I just note my exception, but we thank you for the consideration.

(*Id*. at 603:7-25.)

On October 19, 2015, the arbitration panel issued its award (the "Award").  (2/19 Hirst Cert. Ex. E.)  The panel granted ICA's claim in its entirety, stating that there was no condition of coverage in the Treaties requiring that two or more persons be injured in the same loss

---

[7] "Arb. Tr." refers to the full transcript of the arbitration held in this matter from October 5, 2015 through October 8, 2015.  While portions of this transcript are attached as various exhibits to the parties' papers, a full copy of this transcript was provided to my chambers on a compact disc.

occurrence, that each of the workers' compensation claims constituted a loss occurrence under the Treaties, and that the Treaties provided coverage for the workers' compensation claims. (*Id.* at 2.) In addition, the award provided that—in the event the Kringel claim exceeded $5,000,000—Underwriters II would be liable pursuant to Treaty 0272/04. (*Id.*)

## II.     **Procedural History**

On January 14, 2016, Underwriters I filed a petition to vacate the arbitration award. (16-cv-323, Doc. 1.)[8] Underwriters I also filed a motion to vacate the arbitration award on January 15, 2016. (*Id.* Doc. 4.)[9] Underwriters II filed a petition to vacate or modify the arbitration award on January 18, 2016, (16-cv-374, Doc. 1), along with a motion to vacate or modify the arbitration award, (*id.* Doc. 5), memorandum of law in support of the motion, (*id.* Doc. 6), and a declaration of Joshua Brody with exhibits in support of the motion, (*id.* Doc. 7).

On February 19, 2016, ICA filed in 16-cv-374 its cross-motion to confirm the arbitration award against Underwriters II, (16-cv-374, Doc. 19),[10] memorandum of law in support of the motion, (*id.* Doc. 20),[11] memorandum of law in opposition to Underwriters II's motion to vacate or modify the arbitration award, (16-cv-374, Doc. 18), and a declaration of Gary Hirst with exhibits in support of the motion, (*id.* Doc. 17).

On February 25, 2016, at the parties' request, (16-cv-323, Doc. 18), I ordered that the cases be consolidated, (*id.* Doc. 19).

---

[8] Due to a filing error, the petition was not successfully filed on the docket until January 15, 2016. (16-cv-323, Doc. 2.)

[9] Due to a filing error, the motion was not successfully filed on the docket until January 21, 2016. (16-cv-323, Docs. 6, 7.)

[10] Due to a filing error, the cross-motion was not successfully filed on the docket until February 22, 2016. (16-cv-374, Doc. 21.)

[11] Due to a filing error, the cross-motion was not successfully filed on the docket until February 22, 2016. (16-cv-374, Doc. 22.)

On February 26, 2016, ICA filed a memorandum of law in opposition to Underwriters I's motion to vacate the arbitration award, (Doc. 20), and a cross-motion to confirm the arbitration award, (Doc. 21).   On February 27, 2016, ICA filed a memorandum of law in support of its cross-motion, (Doc. 22), and a declaration of Phillip Loree with exhibits in opposition to Underwriters I's motion to vacate the arbitration award, (Doc. 23).   On February 29, 2016, ICA also filed a declaration of Gary Hirst in opposition to the motion to vacate the arbitration award, (Doc. 24).   ICA subsequently filed an amended declaration of Gary Hirst with exhibits on March 3, 2016.  (Doc. 28.)

On March 18, 2016, Underwriters I submitted a memorandum of law in support of its motion to vacate the award, (Doc. 33), along with a declaration of Timothy Stalker with an exhibit in support of the motion, (Doc. 35).   Underwriter II also submitted a memorandum of law in support of its motion to vacate the arbitration award.  (Doc. 37.)  On April 1, 2016, Underwriters I filed a motion in opposition to Defendants' cross-motions to confirm.  (Doc. 41.) Underwriters II also filed a motion in opposition to Defendants' cross-motions to confirm, (Doc. 44), along with a declaration of Joshua Broudy with exhibits in support of its motion, (Doc. 45).

On April 7, 2016, Underwriters I filed a motion on behalf of all parties seeking oral argument on the pending motions, (Doc. 46), which I took under advisement on April 8, 2016, (Doc. 47).   On April 25, 2016, ICA filed reply memorandums in support of its cross-motions to confirm the arbitration award against Underwriters I, (Doc. 52), and Underwriters II, (Doc. 53), as well as affidavits of Alex Campos, (Doc. 50), and Ricardo Rios, (Doc. 51), in support of these motions.

On July 22, 2016, an entity named IPA Acquisitions, Inc. ("IPA") filed a motion to intervene in this matter pursuant to Federal Rule of Civil Procedure 24(a)(2).  (Doc. 56.)  I held a

telephone conference to discuss IPA's proposed intervention on August 3, 2016 (ECF Dkt. Entry August 3, 2016), and received post-conference submissions from the parties, (Docs. 68-77).  On August 31, 2016 I held a conference at which—for the reasons stated on the record, (*see* Doc. 84) —I denied IPA's motion to intervene, (Doc. 81).

### III.    Legal Standard

The Federal Arbitration Act ("FAA") provides for judicial confirmation of arbitration awards if the parties have consented to such confirmation in their agreement to arbitrate.  *See* 9 U.S.C. § 9.  Regardless of whether the parties have consented to confirmation in their agreement to arbitrate, either party to an arbitration falling within the scope of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention") may also obtain judicial confirmation of an arbitral award.  *See id.* § 207; *Phoenix Aktiengesellschaft v. Ecoplas, Inc.*, 391 F.3d 433, 436 (2d Cir. 2004).

"The value of arbitration lies in its efficiency and cost-effectiveness as a process for resolving disputes outside the courts, and its tendency to foster a less acrimonious process.  To encourage and support the use of arbitration by consenting parties, [the Second Circuit], therefore, uses an extremely deferential standard of review for arbitral awards."  *Porzig v. Dresdner, Kleinwort, Benson, N. Am. LLC*, 497 F.3d 133, 139 (2d Cir. 2007) (internal citations omitted).  "Normally, confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court . . . ."  *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) (internal quotation marks omitted).

A court with jurisdiction "must grant" judgment confirming an award "unless the award is vacated, modified, or corrected."  *Id.* (quoting 9 U.S.C. § 9)  Under the FAA, a court may vacate an arbitration award upon an application of any party to the arbitration:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).  The FAA also provides that a court may modify an award upon an application of any party to the arbitration:

(a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award.

(b) Where the arbitrators have awarded upon a matter not submitted to them, unless it is a matter not affecting the merits of the decision upon the matter submitted.

(c) Where the award is imperfect in matter of form not affecting the merits of the controversy.

*Id.* § 11.

A court can only vacate an arbitration award for evident partiality "where a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration." *Scandinavian Reinsurance Co. v. Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 64 (2d Cir. 2012) (quoting *Applied Indus. Materials Corp. v. Ovalar Makine Ticaret Ve Sanayi, A.S.*, 492 F.3d 132, 137 (2d Cir. 2007)).  The party seeking vacatur must prove evident partiality by "clear and convincing evidence."  *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 106 (2d Cir. 2013).  Further, "arbitration is a matter of contract, and consequently, the parties to an arbitration can ask for no more impartiality than inheres in the method they have chosen."  *Nat'l Football League Mgmt. Council v. Nat'l Football League Players Ass'n*, 820 F.3d 527, 548 (2d Cir. 2016).

The "Supreme Court [has] held that an arbitrator's failure to disclose a material relationship with one of the parties can constitute 'evident partiality' requiring vacatur," but "d[id] not establish a per se rule requiring vacatur of an award whenever an undisclosed relationship is discovered." *Lucent Techs. Inc. v. Tatung Co.*, 379 F.3d 24, 28, 30 (2d Cir. 2004) (discussing *Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145, 147-48 (1968)). This is because "some 'undisclosed relationships . . . are too insubstantial to warrant vacating the award.'" *Id.* at 30 (quoting *Commonwealth Coatings*, 393 U.S. at 152 (White, *J.*, concurring). Further, vacatur of an arbitration award may be unwarranted "where the complaining party should have known of the relationship, or could have learned of the relationship just as easily before or during the arbitration rather than after it lost its cause." *Id.* at 28 (internal citation and quotation marks omitted); *see also CRC Inc. v. Comput. Scis. Corp.*, No. 10 CV 4981(HB), 2010 WL 4058152, at *3 (S.D.N.Y. Oct. 14, 2010). However, where "[a]n arbitrator . . . knows of a material relationship with a party" but fails to disclose it, "[a] reasonable person would have to conclude that [the] arbitrator who failed to disclose under such circumstances was partial to one side." *Applied Indus. Materials*, 492 F.3d at 137.

In addition to these grounds, an award may also be vacated if it exhibits "manifest disregard of the law." *Porzig*, 497 F.3d at 139 (quoting *Goldman v. Architectural Iron Co.*, 306 F.3d 1214, 1216 (2d Cir. 2002)). An arbitral award may be vacated for manifest disregard of the law only if "(1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case." *Wallace v. Buttar*, 378 F.3d 182, 189 (2d Cir. 2004) (quoting *Banco de Seguros del Estado v. Mut. Marine Office, Inc.*, 344 F.3d 255, 263 (2d Cir. 2003)). "A federal court cannot vacate an arbitral award merely because it is convinced that the arbitration

panel made the wrong call on the law." *Id.* "Only 'a barely colorable justification for the outcome reached' by the arbitrators is necessary to confirm the award." *D.H. Blair & Co.*, 462 F.3d at 110 (quoting *Landy Michaels Realty Corp. v. Local 32B-32J*, 954 F.2d 794, 797 (2d Cir. 1992)).  "[R]eview under the doctrine of manifest disregard of the law is highly deferential and such relief is appropriately rare." *Porzig*, 497 F.3d at 139.

## IV.  **Discussion**

Here, Underwriters I makes three principal arguments in support of vacatur:  (1) the award should be vacated because of arbitrator Campos's failure to disclose his extensive business relationships with ICA and individuals associated with ICA as well as his questionable background in the financial services industry; (2) the arbitration violated fundamental fairness to Underwriters I because the arbitration panel failed to adjourn the arbitration to allow for production of material information; and (3) the arbitration award must be vacated because it demonstrates a manifest disregard of the law.  (Underwriters I Br. at 14-42).  Underwriters II joins in these arguments, and also separately contends that—even if upheld—the award should be modified because Underwriters II did not receive proper notice of either the claims themselves or the arbitration, and its interests were therefore not represented before the arbitration panel.  (Underwriters II 1/19 Mem. at 9-15.)[12]  Similarly, Underwriters II also argues that the award should be vacated because the arbitration panel issued a ruling regarding a matter—Underwriters II's liability—not properly brought before it.  Because I find that Arbitrator Campos's significant, undisclosed relationships with principals of ICA compel vacatur of the arbitration award, I need not and do not consider the additional arguments raised by

---

[12] "Underwriters II 1/19 Mem." refers to the Petition to Vacate or Modify Arbitration Award filed on January 19, 2016.  (16-cv-374, Doc. 6.)

Underwriters I for vacatur or Underwriters II for modification.

Underwriters I argues that the award must be vacated because of Arbitrator Campos's significant, undisclosed business relationships with numerous ICA executives demonstrates "evident partiality" sufficient to warrant vacatur of the arbitration award. (Underwriters I Br. at 18-29.) Underwriters I provided evidentiary support for the following facts, which are largely undisputed:

- Arbitrator Campos is the President and CEO of Vensure Employee Services ("Vensure"), and or/the Vensure group of companies, among many other companies. (Stalker Decl. Ex. 11; Campos Cert. ¶ 2.)[13] Vensure and ICA operated out the same suite at the same address:  4140 E. Baseline Road, Suite 201, Mesa, Arizona. (Stalker Decl. Ex. 14, 17; *see also* 3/3 Hirst Cert. ¶ 29.)[14]

- Ricardo Rios, the Treasurer, Secretary, and Director of ICA, (Stalker Decl. Ex. 14), was also the Chief Financial Officer of Vensure, Campos's company, (*id.* Ex. 17). After Underwriters I filed its petition seeking to vacate the arbitration award, Campos and Rios each filed certifications in which they admitted the relationship. (Docs. 50, 51.) As he now admits, Campos "first met Ricardo Rios on or about 2008." (Campos Cert. ¶ 11.) According to Campos, in July 2015 he was looking for a replacement for the position of Chief Financial Officer at Vensure, and he "thought of Mr. Rios, . . . who had impressed [him] and was clearly qualified." (*Id.* ¶ 12.) Campos offered Rios "a temporary, part-time independent contractor consulting position at Vensure and [Rios] accepted." (*Id.* ¶ 12.) Rios continued to work at Vensure until at least the date that Campos signed his certification—April 23, 2016. (*Id.* ¶ 13.) Although Campos now attempts to characterize Rios's position with Vensure as "a temporary, part-time independent contractor consulting position," (*id.* at ¶ 12), Rios was listed on the Vensure website as its Chief Financial Officer, (Stalker Decl. Ex. 17).

- John Iorillo, the President and Director of ICA until March 2014, was listed on the Vensure website as "MGA [Managing General Agent]: Accelerated, LLC." (Stalker Decl. Ex. 14; *see also* Campos Cert ¶ 20 (admitting that Iorillo is the principal of a consulting company that, until March 2014, provided consulting services to both ICA and Vensure).) Iorillo was also the Chief Financial Officer of Infinet, a company connected to another Campos company, PC General Agency. For instance, Campos was involved in and gave testimony during certain

---

[13] "Stalker Decl." refers to the Declaration of Timothy W. Stalker in Support of Certain Underwriting Members at Lloyds of London Motion to Vacate Arbitration Award. (Doc. 12.) "Campos Cert." refers to the Certification of Arbitrator Alex J. Campos filed on April 25, 2016. (Doc. 50.)

[14] "3/3 Hirst Cert." refers to the March 3, 2016 Certification of Gary T. Hirst. (Doc. 28.)

lawsuits filed in 2007 against PC General Agency and Infinet's subsidiary,
Human Dynamic Captive Management.  (Stalker Decl. Exs. 22, 23.)  Campos
testified about meetings with Infinet and a potential merger between Infinet
(Iorillo's company) and PC General Agency (Campos's company).  (*Id.* at Ex. 23
at 23.)  Campos claims to have never had a financial relationship with Iorillo.
(Campos Cert ¶ 20.)

- Benton Morley, ICA's National Claims Manager, was also the National Claims
  Manager for Vensure.  (Stalker Decl. Ex. 21; *see also* 3/3 Hirst Cert. ¶ 30.)
  Campos claims to have never met Morley.  (Campos Cert. ¶ 18.)

- Robert Morley, Vensure's counsel, was Director of ICA until 2012.  (Campos
  Cert. ¶ 19.)  Morley's law firm rents space in the Baseline Center—the same
  complex that houses ICA and Vensure.  (*Id.*)  Morley provided legal services to
  ICA prior to 2014, and he "also provides legal services for Vensure."  (*Id.*)

- Underwriters I also asserts that internet searches from public websites reveal
  connections between Campos and ICA, Iorillo, Rios, Benton Morley and others.
  (*See* Stalker Decl. Ex. 18.)

As discussed above, Article 24 of Treaty 0274/04 required that all of the arbitrators be

active or retired disinterested executive officers of insurance or reinsurance companies.  (2/19

Hirst Cert. Ex. A, at 13.)  During the arbitration panel organizational meeting held on May 11,

2015, the arbitrators each took turns making disclosures concerning their contacts with the

parties and/or individuals associated with or connected to the parties.  (5/11 Tr. 5:19-13:23).  As

quoted above, Campos's only disclosures during the organizational meeting were that he had

some business dealings that never came to fruition with Gary Hirst roughly ten years before the

arbitration.  (5/11 Tr. 12:6-13:23.)  Campos did not discuss or disclose any relationships he had

with Rios, Iorillo, or Morley, or any additional business interactions with Hirst.  He claimed to

have no business relationships with ICA.  (*Id.* at 12:18-20)  Again, at the Arbitration Hearing, in

recognition of the continuing duty on the part of the arbitrators to disclose relationships that

might impact their ability to be disinterested arbitrators, Umpire Hernandez asked whether there

would be any additional disclosures.  (Arb. Tr. 4:14-16.)  In response to that inquiry, Arbitrator

Campos made no disclosures.  (*See id.* at 4:14-5:12.)  This was in spite of the fact that, between

the time of the Organizational Meeting in May 2015 and the Arbitration Hearing in October

2015, Campos hired an ICA principal—Arbitrator Rios—as the CFO of his own company.

Nor did Campos make any subsequent disclosures throughout the arbitration hearing,

despite the fact that:  (1) the arbitration panel was presented with a witness list on September 11,

2015 that included Rios's name, (Stalker Decl. Ex. 20); (2) Rios sat at ICA's table during the

entire 3-day arbitration and was described to the arbitrators as the former controller and current

Treasurer of ICA, (Arb. Tr. 43:13-16; 327:14-18); (3) Campos—with Rios sitting at ICA's

table—was asked during the first day of the arbitration whether he had any additional

disclosures, (*id.* at 4:14-16); (4) Rios was sworn in as a witness on the second day of the

arbitration and testified before the arbitrators, (*id.* at 326:15-22), and (5) the names of Rios,

Iorillo, and Morley were repeatedly mentioned throughout the arbitration hearing, (*see*

Underwriters I Br. at 22-23 (counting number of times each name was mentioned during

hearing)).

ICA contends that the only arbitrator qualification for Arbitrator Campos is that he be

disinterested, which it contends means solely that lack a financial or other personal stake in the

outcome.  (ICA Br. at 19.)  It contends that other Circuits have found that evident partiality

standards either do not apply or are even more relaxed in the case of party appointed arbitrators

in tripartite industry arbitrations, and that the Second Circuit has not yet considered the matter.

(*Id.* at 20.)  Here, ICA argues that the parties' decision to permit ex parte contacts through the

discovery time period demonstrates that the parties did not intend the arbitrators to be impartial,

(*id.*), and that an arbitrator's failure to follow ethical rules or guidelines concerning disclosure

does not demonstrate evident partiality, (*id.* (citing *Scandinavian Reinsurance Co.*, 668 F.3d at

77)).  ICA argues that, to the contrary, Campos did not have a personal or financial interest in the outcome of the litigation, (3/3 Hirst Cert. ¶ 16),[15] which is enough to fulfill the only requirement for Campos, that he be disinterested, (ICA Br. at 21).

Here, I agree that the nondisclosure does not—taken alone—demonstrate evident impartiality, and therefore the citations to arbitration codes of ethics provided by Underwriters I are not dispositive.  (*See* Underwriters I Br. at 16-17.)  However, those citations certainly support the notions that disclosures are routinely made in arbitrations and that the best practice for an arbitrator is to err on the side of disclosure.  The question here is "whether the *facts* that were not disclosed suggest a material conflict of interest," such that "a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration."  *Scandinavian Reinsurance Co.*, 668 F.3d at 77, 72.  Here, those facts include clear, unrebutted evidence that a party-appointed arbitrator failed to disclose material relationships with principals of ICA, one of the parties before the arbitration panel, and his relationship with ICA itself.  Of particular relevance is the undisclosed relationship with Ricardo Rios, the Treasurer, Secretary, and Director of ICA, who Campos hired just months prior to the Arbitration Hearing as his company's Chief Financial Officer.  The undisclosed fact that Campos's company shares with ICA not only an address, but the same suite within that address, also suggests a material conflict of interest.  (*See* Stalker Decl. Exs. 14, 16, 17.)

I believe these undisclosed relationships are significant enough to demonstrate evident partiality, and therefore vacatur is appropriate.  The Second Circuit has advocated a "case-by-case approach in preference to dogmatic rigidity" in assessing evident partiality, *Lucent Techs. Inc.*, 379 F.3d at 28, and therefore any guideposts provided by previous decisions are not

---

[15] "3/3 Hirst Cert." refers to the March 3, 2016 Certification of Gary T. Hirst.  (16-cv-323 Doc. 28.)

dispositive.  However, the Circuit has also not hesitated in finding evident impartiality where the undisclosed financial relationship would lead a reasonable person to conclude that the arbitrator was partial to one side.  *See Applied Indus. Materials*, 492 F.3d at 135 (arbitrator knew of potential business relationship between a branch of his corporation and an arbitrating party). And I note that the relationships here are far more significant, more numerous, and involve more financial entanglements than are present in cases where the Circuit has found undisclosed relationships too insubstantial to warrant vacating arbitration awards.  *Cf Scandinavian Reinsurance Co.*, 668 F.3d at 74 (finding two arbitrators serving together in two similar arbitrations simultaneously not sufficient enough to vacate award); *Lucent Techs. Inc.*, 379 F.3d at 28-31 (finding no evident partiality where arbitrator failed to disclose both his past work as an expert witness for one of the parties and his past co-ownership of an airplane with another arbitrator); *Andros Compania Maritima*, 579 F.2d at 696, 701-02 (finding no evident partiality where umpire failed to disclose past joint service on nineteen arbitral panels with president of firm that acted as one party's agent).

Although the Second Circuit has not mandated the use of any test to determine evident partiality, the court has described the Fourth Circuit's evident impartiality test as "helpful." *Scandinavian Reinsurance Co.*, 668 F.3d at 74.  This test has four prongs:

> (1) the extent and character of the personal interest, pecuniary or otherwise, of the arbitrator in the proceedings; (2) the directness of the relationship between the arbitrator and the party he is alleged to favor; (3) the connection of that relationship to the arbitrator; and (4) the proximity in time between the relationship and the arbitration proceeding.

*Id.* (quoting *Three S Del., Inc. v. DataQuick Info. Sys., Inc.*, 492 F.3d 520, 530 (4th Cir. 2007)). Here, viewing the facts Campos failed to disclose with these four factors in mind demonstrates that the facts Campos failed to disclose were significant.  Campos had close business

21

relationships with numerous principals of ICA, a party to the arbitration, and the number and variety of these relationships suggest he was personally acquainted with some of these individuals over a number of years.  In addition, Campos's business operated out of the same office space as ICA, and the relationships which he failed to disclose throughout the arbitration were longstanding and ongoing at the time of the arbitration.  Where "[a]n arbitrator . . . knows of a material relationship with a party" but fails to disclose it, "[a] reasonable person would have to conclude that [the] arbitrator who failed to disclose under such circumstances was partial to one side." *Applied Indus. Materials*, 492 F.3d at 137.

Although I do not rely on the following observation in reaching my decisions, I find it troubling that neither Arbitrator Campos nor Ricardo Rios acknowledged that they knew one another throughout the three-day arbitration.  This apparent willful avoidance suggests that they were intentionally hiding their relationship from the other arbitrators and the representatives of Underwriters I.

I also find ICA's arguments to the contrary unavailing.  In particular, the gravamen of ICA's argument is that evident partiality standards should apply with reduced force, or not at all, in matters such as the one here:  party appointed arbitrators in tripartite industry arbitrations. (ICA Br. at 20.)  ICA is simply misreading the law.  ICA argues that the Second Circuit has not considered this situation, but the matter before the court in *Scandinavian Reinsurance* involved precisely this situation.  *See Scandinavian Reinsurance*, 668 F.3d at 64-65.  Indeed, the agreement at issue in *Scandinavian Reinsurance* laid out almost precisely the same standards for arbitrators and composition of the arbitration panel as the Treaties here.  *Compare id.* at 65 (noting that the agreement at issue "required that such disputes be 'submitted for decision to a panel of three arbitrators'—two party-appointed arbitrators and an umpire—all of whom would

be 'disinterested active or former executive officers of insurance or reinsurance companies or Underwriters at Lloyd's, London'"), *with* 2/19 Hirst Cert. Ex. A, at 13 ("One Arbiter shall be chosen by the Reinsured, the other by the Reinsurer, and an Umpire shall be chosen by the two Arbiters before they enter upon arbitration, all of whom shall be active or retired disinterested executive officers of insurance or reinsurance companies or Lloyd's London Underwriters.").  In *Scandinavian Reinsurance*, the Second Circuit considered and analyzed the arbitrator's contacts and relationships using the Second Circuit's traditional evident partiality standards, *see* 668 F.3d at 72-73, and never suggested that the nature of the case—involving party-appointed arbitrators in tripartite industry arbitrations—would or should somehow result in a lesser standard. Arbitrator Campos's conduct must be considered under the same evident partiality standard as is required in all arbitrations.  As noted above, I believe that standard compels a finding of evident partiality here.

### V.      Conclusion

Arbitrator Campos's failure to disclose his significant relationships with principals of ICA, and with ICA itself, requires vacatur of the arbitration award.  Underwriters I's motion to vacate the arbitration award, (16-cv-323, Doc. 6), is GRANTED, and ICA's cross-motion to confirm the arbitration award against Underwriters I, (16-cv-323, Doc. 21), is DENIED. Moreover, because—in addition to its arguments for modifying the award—Underwriters II also joined in Underwriters I's arguments in support of vacatur, Underwriters II's motion to vacate the arbitration award, (16-cv-374, Doc. 5), is GRANTED, and ICA's cross-motion to confirm the arbitration award against Underwriters II, (16-cv-374, Doc. 21), is DENIED.  To the extent Underwriters II sought to modify the arbitration award, its motion, (16-cv-374, Doc. 5), is DENIED as moot.  Finally, the pending motion for oral argument, (Doc. 46), is DENIED.

The Clerk of Court is respectfully directed to close all pending motions, and to close this case.

SO ORDERED.

Dated: March 31, 2017
New York, New York

Vernon S. Broderick
United States District Judge